[Crim. No. 609.    Third Appellate District.—August 4, 1922.]

## THE PEOPLE, Respondent, v. JAMES ROE, Appellant.

[1] CRIMINAL LAW — CRIMINAL SYNDICALISM — SUFFICIENCY OF INDICTMENT — WAIVER OF OBJECTION.—The objection that an indictment for the violation of the Criminal Syndicalism Act does not conform to the provisions of sections 950, 951, and 952 of the Penal Code is waived by a failure to demur, and cannot be raised by a motion in arrest of judgment after conviction.

[2] ID.—SUFFICIENCY OF INDICTMENT.—Where the charge of criminal syndicalism is based on subdivisions 1, 2, 3, and 5 of section 2 of the act, the acts enumerated in said subdivisions as constituting criminal syndicalism must be pleaded with a degree of particularity that will impart to the accused precise information of the acts with the commission of which he is charged and which, with the evidence adduced to sustain such charge, upon the conviction of the accused thereof, will operate as a bar to another or further prosecution for the same specific acts of criminal syndicalism; but where the charge is the violation of subdivision 4 of said section of the act the statement in the indictment or information is sufficient if it is in the language of said subdivision.

[3] ID.—CHARACTER OF ORGANIZATION—EVIDENCE.—In a prosecution under subdivision 4 of section 2 of the Criminal Syndicalism Act, testimony concerning the placing of an acid or chemical in the shoes of the witness and other fellow-workers on a certain ranch, as the result of which they were compelled to cease work and seek immediate medical treatment, and concerning the finding of certain I. W. W. literature in the bunk-house of such men, coupled with other testimony that such acid or chemical was one of the instrumentalities employed by said organization to terrorize laboring men not members thereof, is admissible, not for the purpose of connecting defendant with said acts, but for the sole purpose of showing the character of the organization with which the defendant is charged with knowingly being a member.

[4] ID.—ENFORCEMENT OF PRINCIPLES — EVIDENCE.—In such a prosecution, testimony of ex-members of the Industrial Workers of the World as to the principles advocated by said organization and its activities for many years prior and subsequent to the time at which the legislature passed the Criminal Syndicalism Act in carrying out such principles by a variety of violent means is admissible as tending to disclose the character of said organization.

[5] ID.— ULTIMATE PURPOSE AND METHODS OF I. W. W. — KNOWLEDGE OF DEFENDANT—EVIDENCE.—In this prosecution under subdivision 4 of section 2 of the Criminal Syndicalism Act, in which the defendant admitted that he was a member of the Industrial Workers of

the World, the evidence as to the ultimate purpose and the methods of that organization showed that such organization came clearly within the inhibitions of the act, while the record disclosed evidence of circumstances which were sufficient to persuade the jurors to the conviction that the defendant knew at all times that said organization advocated and taught criminal syndicalism.

[6] ID.—SABOTAGE—KNOWLEDGE — INSTRUCTIONS. — In this prosecution under subdivision 4 of section 2 of the Criminal Syndicalism Act, the trial court did not commit error in refusing defendant's requested instructions involving a definition of the word "sabotage" as the same is used in the act and the knowledge of the defendant as to the character of the Industrial Workers of the World, such requested instructions having been covered by other instructions which were given.

APPEAL from a judgment of the Superior Court of Sacramento County and from an order denying a new trial. Malcolm C. Glenn, Judge. Affirmed.

The facts are stated in the opinion of the court.

Austin Lewis and R. M. Royce for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant was indicted and tried for and convicted of the crime of violating certain provisions of the act of the legislature of 1919 penalizing what is generically described by said act as "criminal syndicalism." (Stats. 1919, p. 281.) He presented a motion for a new trial, which was denied, and the appeals are from the judgment and the order denying his motion for a new trial.

The defendant, for a reversal of the judgment and the order, contends: 1. That the indictment is violative of sections 950, 951, and 952 of the Penal Code, in that the purported statement therein of the act or acts constituting the offense sought to be charged is not set forth "in such manner as to enable a person of common understanding to know what is intended," that it does not conform to the form of an indictment as is exemplified by section 951, and that it is lacking in directness and certainty as to "the particular circumstances of the offense charged," the claim being that, to state the offense which is by the indictment

attempted to be lodged against the accused, the circumstances essential to the completion of said offense under the statute must be set forth with particularity; 2. That error was committed in the admission of certain testimony; 3. That the evidence is insufficient to support the verdict; 4. That the court erred to the prejudice of the substantial rights of the accused by its refusal to read to the jury two certain instructions proposed by him.

[1] 1. No demurrer was interposed to the indictment, but a motion in arrest of judgment was, after conviction, made by the defendant upon the ground that it does not conform to the requirements of sections 950, 951, and 952 of the Penal Code. (See sec. 1004, Pen. Code.) Of course the question of the sufficiency of the facts to state a public offense was not raised by the motion. The objection to the indictment upon the ground upon which the motion in arrest of judgment was based is deemed to have been waived by the failure to demur to that pleading. (Pen. Code, sec. 1185; *People* v. *Tomsky,* 20 Cal. App. 672, 677. [130 Pac. 184].) We will, however, briefly consider the objection. To do this, it will be necessary first to examine some of the provisions of the statute defining "criminal syndicalism" and upon certain of whose provisions the indictment against the accused is based.

The first section of said act reads as follows: "The term 'criminal syndicalism' as used in this act is hereby defined as any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, sabotage (which word is hereby defined as meaning willful and malicious physical damage or injury to physical property), or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or affecting any political change."

The second section, in subdivisions 1, 2, 3, 4, and 5 thereof, describes or specifically enumerates as many different and distinct acts as coming within the description of "criminal syndicalism" as the same is defined in section 1. Upon subdivision 4 of section 2 the indictment here is founded. Said subdivision reads: Any person who "organizes or assists in organizing, or is or knowingly becomes a member of any organization, society, group or assemblage of persons

organized or assembled to advocate, teach or aid and abet criminal syndicalism," is guilty of a felony, etc.

The indictment is, substantially, in the language of said subdivision 4 of section 2 of the statute and is as follows:

"The said James Roe on the —— day of June A. D. 1921 at the County of Sacramento, in the State of California, and before the finding of this indictment was then and there willfully, unlawfully, feloniously and knowingly a member of an organization, society, group and assemblage of persons known and designated as 'The Industrial Workers of the World,' and sometimes known and referred to as the 'I. W. W.'; which said organization, society, group and assemblage of persons was then and there organized and assembled to advocate, teach, and aid and abet criminal syndicalism contrary," etc.

[2] The position of the defendant is that, since the people, in proof of the charge, relied, to a large extent, upon certain literature issued by and under the authority of the organization to which the defendant is alleged to belong, in the form of books, booklets, magazines, and other like publications, in which the principles of said organization were declared and advocated, it was incumbent upon the prosecution to plead such publications or printed matter, or so much thereof as would constitute the offense of criminal syndicalism as it is denounced or defined by said subdivision. We need not follow the learned argument of counsel for the defendant supporting this proposition. It is sufficient to say that the same point arose, was considered and decided adversely to the position of the defendant in the cases of *People* v. *Steelik*, 187 Cal. 361 [203 Pac. 78], and *People* v. *Taylor*, 187 Cal. 378 [203 Pac. 85]. It is held in those cases that, while the charge of criminal syndicalism in an indictment or information is insufficiently stated unless the acts specified in the statute as constituting the same are specifically set forth in such pleading, said crime is sufficiently stated where it is based upon subdivision 4 of section 2 of said statute if the accusatory pleading merely charges the crime in the language of said subdivision. In other words, those cases hold that where the charge of criminal syndicalism is based on subdivisions 1, 2, 3, and 5 of section 2, the acts enumerated in said subdivisions as constituting criminal syndicalism must be pleaded with a degree

of particularity that will impart to the accused precise information of the acts with the commission of which he is charged and which, with the evidence adduced to sustain such charge, upon the conviction of the accused thereof, will operate as a bar to another or further prosecution for the same specific acts of criminal syndicalism; but that, where the charge is the violation of subdivision 4, the statement in the indictment or information is sufficient if it is in the language of said subdivision, since the acts therein denounced as acts of criminal syndicalism are sufficiently described by the language itself of said subdivision to make it perfectly clear what was thereby intended. In the Steelik case the court said, quoting the *syllabus:* "An indictment charging a defendant with belonging to the Industrial Workers of the World sufficiently charges an offense under subdivision 4 of section 2 of the act." This language is, of course, to be read with the qualification that the indictment must also show or allege that the Industrial Workers of the World constitute an organization banded together for the purpose of advocating, teaching, or aiding and abetting criminal syndicalism as said crime is described by section 1 of the act; and the indictment upon which the defendant was tried and convicted, it will be observed, specifically so alleges or charges. There is nothing said in the Taylor case, *supra,* at variance with what is said in the Steelik case regarding the point under consideration. In the Taylor case it is said: "On the consideration of the petition for a transfer, we were inclined to the opinion that where a defendant was charged with advocating a certain doctrine or printing a certain book or pamphlet or circulating the same, it was essential that the name and description of the document, book, etc., should be contained in the indictment for the information of the defendant."

The court said, however, that the question did not arise in that case for the reason that as to the counts in the indictment based on the subdivisions of section 2 denouncing as an offense the act of printing or publishing or distributing literature in any form which advocated the commission of acts of criminal syndicalism the jury had disagreed and said counts were thereupon dismissed. It is thus to be noted that the court did not decide the point; but if it had and so had held that, as to an indictment based upon

the subdivisions relating to spoken or printed words or books or pamphlets advocating acts of criminal syndicalism, such spoken or written words or books or pamphlets should be pleaded or named and described, it is clear, as has been explained, that the rule so laid down would have no application to the indictment against the defendant in this case.

[3] 2. The first of the several assignments of error based upon rulings admitting certain testimony arose as follows: One Arada, a laborer, with some forty-eight or more other laborers, in the month of August, 1917, was employed to dig potatoes on a ranch about fifteen miles from the city of Stockton, and, while so engaged, some fourteen other men made their appearance at said ranch and applied to the owner of the ranch for like employment, and were put to work, commencing their labors in the afternoon, shortly after the lunch hour. These fourteen men worked all of the afternoon and at night retired in the "bunk" house on the ranch with the other men. On the following morning the fourteen men referred to abandoned the work and left the farm. The other men (those at work when the fourteen arrived at the ranch) resumed work that morning, but had not proceeded far when their feet developed a burning sensation, the pain therefrom increasing within a short time to such an intensity that it became unbearable and so they could not proceed with their labors. On removing their shoes, and inspecting the inside thereof, they discovered that acid in the form of a powder—something of the color of brown sugar—had been deposited therein by some party or parties. The injury thus inflicted upon them required them to cease work and seek immediate medical treatment. Arada testified that he was so crippled as the effect of the burns thus produced that he was compelled to remain in the county hospital under treatment for over a year. In fact, he testified, it was for a while thought by the attending surgeons that it would be necessary, to preserve his life, to amputate one of his lower limbs. Neither Arada nor the other men with whom he was working when the "fourteen" appeared at the ranch were members of the Industrial Workers of the World. After the "fourteen" left the ranch, some I. W. W. papers were found in the "bunk" house in which they slept the night they remained on the ranch. The objection to this testimony was that it was hear-

say and further, that the acts were not connected up to the I. W. W. organization and, consequently, not binding upon the defendant. Other witnesses in the case (former members of the I. W. W.) testified that a certain chemical combination (described by one of them as such a solution of potassium with other chemicals as would immediately produce burns when the solution came in contact with a body containing moisture) was one of the instrumentalities employed by said organization to terrorize laboring men who were not members of the organization and thus so to intimidate them as to cause them to refuse to take employment in the fields or fruit orchards of the country. This description of this chemical combination tallied, substantially, with the description given by the witness, Arada, of the chemical particles which were placed in the shoes of the laborers with whom the said Arada was working at the time of the incident referred to by him. This testimony, together with the circumstance of the finding of I. W. W. papers at the ranch after the ''fourteen'' men had departed therefrom, it being also shown that prior to the arrival of said ''fourteen'' men at said ranch no such papers were seen on or about the premises, constituted a sufficient foundation for the allowance of Arada's testimony, which was admissible, not for the purpose of connecting the defendant with the act or acts supposed to have been committed by the ''fourteen'' men, but for the sole purpose of showing the character of the organization to which the defendant is alleged to belong and to which the circumstances as revealed by said testimony and other testimony as to the practices of the organization strongly tend to show the ''fourteen'' men belong or belonged.

[4] The other like assignments of error involve rulings permitting, over objections by defendant, certain ex-members of the I. W. W. organization to testify in detail as to the principles advocated by said organization and its activities for many years prior and subsequent to the time at which the legislature passed the Criminal Syndicalism Act in carrying out by a variety of violent means said principles. This testimony was admissible as tending to disclose the character of said organization, and this is even true if the principles so advocated and the acts so practiced were advocated and practiced by the organization before the de-

fendant became a member thereof. This proposition, however, is fully examined and clearly explained and all the objections urged here against the testimony referred to conclusively answered in the Steclik case, *supra,* as follows:

"In this case, the only question the defendant can be heard upon is whether or not the evidence of the conduct of members of the I. W. W. before the passage of the act is admissible as tending to establish the character of the organization after the passage of the act and during the time the defendant belonged thereto. It seems too clear for discussion that where the issue involves the character of an organization it is proper to determine the character of the organization from the conduct of its members and officers, including the propaganda which it publishes. It is no doubt true that the presumption of innocence would overcome the legal presumption that when the nature of a thing is once shown it is presumed that it continues thereafter as long as such thing usually continues (Code Civ. Proc., sec. 1963, subd. 32). But where such proof is fortified by actual proof that subsequent to the passage of the act the organization continued to publish the same sort of propaganda, it is proper to consider the evidence of the conduct of the organization both before and after the passage of the statute in order to determine whether or not it is such an organization as is denounced by the statute. As the defendant knowingly continued his membership in the organization after such conduct had been denounced by the statute as criminal, he is liable, not for what the organization did before he joined it or for its character before the statute was passed, but because after the statute was passed he violated the terms thereof by knowingly remaining a member thereof. It is contended that the evidence of these members of the I. W. W. was inadmissible for the further reason that it consisted of declarations of co-conspirators and was not admissible until the conspiracy was established by other evidence than such declarations. In making this contention the appellant wholly misconceives the applicability of the rule with reference to the declarations of co-conspirators. The evidence adduced in court by the co-conspirators as witnesses are not declarations of conspirators, but direct testimony to the facts to which they testify. Aside from the discredit which attaches to them as accom-

plices, their evidence is entirely competent to establish the facts to which they testify. The rule for which counsel contends is applicable only when it is sought to introduce extrajudicial declarations and statements of co-conspirators.''

[5]  3. The point that the evidence is insufficient to support the verdict is entirely without merit, to confirm which statement it will be necessary to go no further than to refer herein in a very general way to the evidence.

The fact that, at the time of his arrest, the defendant was a member of the organization known as the Industrial Workers of the World and had been such member since the year 1918, was admitted by him not only at the time of his arrest but also when he testified at the trial of this case in his own behalf. As to the character of said organization, its principles, policies, and practices, it is clear that there is ample evidence to show that the implied finding of the jury that the propaganda sponsored and spread over the world by said organization involves not only the teaching of political principles, revolutionary in their character, but also the sanctioning and advocacy of violent and criminal methods for the carrying out of those principles.

The defendant was arrested on the twenty-second day of June, 1921, at 3d and O Streets, in the city of Sacramento, by two police officers of said city, upon telephonic information to the effect that he was selling and distributing what is known as I. W. W. literature. In his possession was a canvas bag or knapsack which contained many copies of magazines, books, booklets, and pamphlets in which were printed articles or addresses vigorously supporting and advocating the I. W. W. cause and its objects and the methods of putting its principles into effect. The defendant admitted that he was selling and thus distributing these publications. They consisted of thirty or more printed documents, here introduced in evidence and copious extracts therefrom read to the jury and so incorporated into the record of this case. The general purpose of said organization, as it was disclosed by the publications referred to, is to secure control of the government of the United States and of the state governments, and substitute for our present form of government what said organization calls an industrial government—that is to say, said organization believes

in and vigorously advocates a government in which all laws
shall be made in the workshop instead of by the legislature.
According to the publications referred to said organization
teaches that our government as it now exists "is merely a
reflex of the industrial conditions of the country; that the
governments we have to-day are the instruments of the
capitalist class; and as an organization they [the members
thereof] ignore the government. They have their own gov-
ernment, their own rules, their own regulations and they
abide by those and no other." The "preamble of the In-
dustrial Workers of the World" very clearly illustrates their
attitude or position toward the governments of this country.
It reads in part: "The working class and the employing
class have nothing in common. There can be no peace as
long as hunger and want are found among millions of the
working people and the few who make up the employing
class have all the good things of life. Between those two
classes a struggle must go on until the workers of the
world organize as a class, take possession of the earth and
the machinery of production, and abolish the wage system."
Upon its face the foregoing does not appear to state more
than an innocent or a legitimate economic proposition. No
one of sense and fairness will deny the right of the labor-
ing classes to maintain an organization for proper self-pro-
tection. No sensible and fair person will deny that an
equitable division of the profits accruing from the combined
operation of capital and labor between these two essential
elements of industrial progress and prosperity should be had.
Nor is it a crime *per se,* or, for that matter, a crime at all,
for a person or a class of persons to advocate a scheme con-
ceived according to Utopian ideals for the government of
the peoples of the earth and an equal distribution among all
the people of the fruits of all material or industrial activity
in all its manifold forms. Such a condition, if practicable
under the existing order of things in this world, would
certainly present an ideal situation of the most exalted
character. Such may be the real ultimate object of the
I. W. W. and kindred organizations, but if this be so, it
will readily be admitted that the scheme is wholly chimeri-
cal, as undoubtedly More, who sought to establish the same
sort of political philosophy through his "Utopia," and Bel-
lamy, following the same general line of thought, essayed

the presentation of an analogous conceit in his "Looking Backward," really themselves believed. While, as stated, there is no criminal purpose to be imputed to the fact of the mere advocacy of a plan for the government of the peoples of the earth which would or might bring to them what may well be termed a condition of consummate beatitude in worldly affairs, yet, when in attempting to crystallize such a condition any organization resorts to criminal acts of any character or proposes to do it by the destruction of property and vested rights, then it has clearly transcended the line of demarcation between right and wrong; and the vice of the whole scheme of the organization known as the I. W. W. is, according to the testimony in this case, in the methods which it advocates and to which its members without scruples resort for carrying out its principles, and as to this phase of the case the record before us overflows with proof of the most dastardly crimes known to the criminal law which were resorted to for the avowed purpose of terrorizing the people, in the vain hope of intimidating them into accepting the propaganda of the I. W. W. as the true faith in the matter of government. According to the testimony of the two witnesses, who, as above stated, were former members of the Industrial Workers of the World (Coutts and Dymond by name), the members of that organization not only believe in and teach the overthrow of our present system of government, but sanction as the means for accomplishing that result the crime of arson, sabotage, which means the willful destruction of the machinery of industry and other property, and any other act which, in their judgment, will instil into the people at large a feeling of absolute terror. Numerous instances of fires started by members of the organization whereby valuable properties were destroyed were given by Dymond in this case. For instance, he testified that in Stanislaus County in the year 1917, during one night, some eight haystacks containing large quantities of hay and situated on as many different ranches in near proximity to each other, were set on fire and destroyed, the several fires burning at the same time or almost simultaneously. In the city of Modesto in the same year, so Dymond proceeded, eight different stables and their contents were destroyed by incendiary fires on a single night. Dymond testified that he personally knew that this

wholesale destruction of property was caused by the direct
acts of members of the I. W. W. He further testified that
while no specific action was ever taken by the organization,
as such, authorizing the destruction of property by the mem-
bers thereof by acts of sabotage or other criminal means, it
was, nevertheless, one of the rules of the organization that
the members thereof in such matters should act upon their
own initiative whenever they thought it necessary to accom-
plish a particular object or the ends of the general purposes
of the organization. In a word, both he and Coutts testified
that the organization and its members believed in and ad-
vocated "direct action"—that is, instead of resorting to law-
ful methods or pacific means for the redress of what they
conceived to be the industrial wrongs inflicted upon them
or for the adjustment of any grievances arising between
the laboring element and the capitalistic class, they believed
in and advocated the taking of such matters into their own
hands and settling them according to their own methods.
The organization, said these witnesses, had no more sym-
pathy for members of the American Federation of Labor
than it had for the capitalistic class, and that one of its
own aims was to block by any means which would accom-
plish that end, howsoever criminal they might be, every act
or step taken by the former organization to maintain a high
wage standard for its members. The theory of this line of
thought seems to be that no contract or compact of any
kind or nature should be made between the laboring men
and the capitalistic class. In other words, it is antagonistic
to the principles of the I. W. W. organization to recognize
the right of any man or set of men to fix or establish the
compensation for labor; that the whole industrial and
politico-economic system as it exists to-day is without a just
foundation and is at variance with every correct idea of in-
dustrial rights and economy. Asked what was the attitude
of the members of the I. W. W. toward men and women
who had been sent to prison for the commission of crime,
Dymond replied that persons so convicted and who had
served terms of imprisonment in the penitentiaries of the
country were regarded by the members of said organization,
regardless of the nature of their crimes, as martyrs. But it
is not necessary to proceed further in a review of the evi-
dence or in setting forth the principles of the organization

to which the defendant admitted that he belonged and the violent methods which that organization was shown to advocate for the accomplishment of its objects. From the record, reams and reams could be written and recited of the utterances, printed and spoken, of the members of that organization, advocating the destruction of our present system of government and of criminal acts and conduct by members directed to the advancement of that ultimate object of said organization. There now has been presented herein a sufficient explanation or exposure of the cardinal principles, the ultimate purpose and the methods of the Industrial Workers of the World, as the same were revealed by the testimony, documentary as well as oral, by the record before us, to show that, as maintained at and before the trial of this case, they constituted an organization which comes clearly within the inhibitions of the Criminal Syndicalism Act of this state.

We may add that the testimony generally in this case is very much of the same character as that which was presented in the cases of *People* v. *Steelik, supra,* and *People* v. *Taylor, supra,* of which synoptical statements are given in the opinions therein.

But the point is urged that there is no testimony showing that the defendant became and continued to remain a member of said organization knowing or having knowledge that its object was to advocate, teach, or aid and abet criminal syndicalism. The record discloses evidence of circumstances which, if accepted as verity by the jury, as evidently it was, were sufficient to persuade the triers to the conviction that the defendant knew at all times that said organization advocated and taught criminal syndicalism. It is not necessary to make special reference to these circumstances.

[6] 4. The court refused to allow two instructions proposed by the defendant and it is here claimed that in such refusal prejudicial error was committed. The first of these involved a definition of the word "sabotage" as the same is used in the statute, and further declared that "sabotage" as so defined "must be used as a means of accomplishing a change in industrial ownership or control or effecting a political change," and that unless unlawful acts or violence are employed as a means of accomplishing a change in in-

dustrial ownership or control or effecting a political change, such acts or violence do not come within the scope of the "Criminal Syndicalism Act."

That instruction was substantially covered by the instruction, given by the court, in the language of section 1 of the act in question, wherein "criminal syndicalism" is defined, and wherein also the word "sabotage" is defined as meaning "willful and malicious physical damage or injury to physical property," and by the further given instruction to the effect that, to justify a conviction, it was necessary to show beyond a reasonable doubt not only that the defendant was, at the time mentioned in the indictment, a member of the Industrial Workers of the World, and that said organization was then and there a society or group or assemblage of persons then and there organized or assembled to advocate, teach, or aid and abet criminal syndicalism as that term is defined in the statute and in "these instructions," etc., but also that the defendant then and there knew and had knowledge that the purpose and objects of said organization, etc., "were and was the commission of the acts denounced by the criminal syndicalism law," etc.

The other instruction which the defendant proposed and the court disallowed was covered by the given instruction above considered. It would have told the jury what the court did tell them that "in order to convict the defendant, you must be convinced beyond a reasonable doubt that between the date of this act going into effect and the twenty-second day of June, 1921, the date of his arrest, defendant did discover and know that the organization herein referred to as the I. W. W. was an organization for the purpose of advocating, teaching, aiding, and abetting criminal syndicalism." The court having given substantially a similar instruction—one covering precisely the same principle— the refusal to repeat it is, of course, no ground for just complaint.

The defendant appears to have been fairly tried and legally convicted, and the judgment and the order are, therefore, affirmed.

Burnett, J., and Finch, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 2, 1922.

All the Justices present concurred.

Richards, J., *pro tem.*, was acting.