[Crim. No. 700.   Third Appellate District.—February 27, 1924.]

## THE PEOPLE, Respondent, v. FRANK BAILEY et al., Appellants.

[1] CRIMINAL SYNDICALISM ACT — REFORMATION OF I. W. W. — EVIDENCE.—In this prosecution for a violation of subdivision 4 of section 2 of the Criminal Syndicalism Act, the defense having introduced documentary and other evidence for the purpose of showing that subsequent to the passage of said act and subsequent to the commission of certain crimes by members of the I. W. W. organization, as testified to by witnesses for the prosecution, that organization had changed its policy for carrying out its ultimate objects, that it denounced and proclaimed against the resort by the members of the organization to the commission of acts of violence of any character in furtherance of the purposes thereof, and that all literature advocating sabotage or other criminal violence had been destroyed, whereas witnesses for the prosecution, ex-members of the I. W. W. organization, testified that such purported reformation by said organization was a mere subterfuge and that it was understood between the members that the same destructive policy should be pursued as it always had by said organization, it was for the jury to determine which evidence was to be believed.

[2] ID.—LAWFUL PLATFORM — VIOLENT METHODS — EVIDENCE — PROVINCE OF JURY.—In such a prosecution, while it cannot be said that, upon the face of its platform of principles, in advocating the practical application thereof, the I. W. W. organization is not within the rights guaranteed to all citizens by the federal and state constitution, the jury is entitled to weigh the facts that

1.   Validity of legislation directed against social or industrial propaganda deemed to be of a dangerous tendency, notes, 1 **A. L. R.** 336; 20 **A. L. R.** 1543.

66 Cal. App.—1

the scheme proposed to be established by that organization for the government of society is wholly fanciful and impractical, that it is a paradoxical nction of government, and that it would seem to involve a recidivation to that primitive society in which might stood for right, in connection with the evidence showing that violent methods had been resorted to by the organization, in determining whether said organization had reformed or still believed in, advocated, taught, and sanctioned such methods for establishing its propaganda.

[3] ID.—METHODS OF ORGANIZATION—OPINION EVIDENCE BY MEMBERS. In such a prosecution, testimony by ex-members of the I. W. W. organization, relative to the methods adopted, practiced, and advocated by the organization as in aid of the attainment of its paramount objects, is not rendered inadmissible by reason of the fact that such testimony may now and then involve the expression of the opinions and conclusions of the witnesses, where such witnesses further testify that all their information was acquired while they were members of the organization and at meetings when the matters referred to were discussed and explained.

[4] ID.—DOCTRINES PROMULGATED IN BOOK—CONTINUED ADHERENCE—EVIDENCE.—In such a prosecution, it is not error to permit a witness for the people, who was an ex-member of the I. W. W. organization, to read certain passages from a book purporting to have been published under the authority of that organization and to state whether or not said organization still adheres to the doctrines promulgated in said book and to which his attention has been directed by the district attorney.

[5] ID.—HEARSAY EVIDENCE OF CRIMES—ABSENCE OF PREJUDICE.—In this prosecution for a violation of subdivision 4 of section 2 of the Criminal Syndicalism Act, while it was error to permit a witness for the people to testify that he had met and talked with other members of the organization when he was a member thereof and that they had told him· they had but recently committed the crime of arson, such error did not result in a miscarriage of justice, in view of the large quantity of incriminatory testimony presented against the defendants.

[6] ID.—PAST LITERATURE—EVIDENCE—REBUTTAL.—In such a prosecution, literature of the I. W. W. organization advocating, at least by implication, acts of violence by its members, is admissible, even though it was published by said organization a long time prior to the passage of the Syndicalism Act, and the burden is upon the defendants to prove that subsequent to the publication of such literature the organization receded from the policies therein advocated; and even where the defendants have introduced evidence designed and tending to prove such defense, it is for the jury to determine from all the evidence whether the organization had reformed its methods to accomplish its point.

[7] ID.—PROOF OF OTHER CRIMES—ERRONEOUS EVIDENCE.—In such a prosecution, even though the defense has been permitted to introduce in evidence an article contained in a magazine published some years previous under the authority of the I. W. W., stating that said organization had adopted peaceable means for carrying out its objects and that it was unalterably opposed to the use of violence or criminal acts for its purposes, it is error to permit the district attorney, in rebuttal, to offset the effect of said article, to introduce in evidence a list (published in the same issue of said magazine) of the members of the I. W. W. who had been arrested and charged with a violation of the Criminal Syndicalism Act, some being convicted, others acquitted, and others as to whom indictments were dismissed, all these proceedings being inaugurated subsequent to the time at which, according to said magazine article, the organization declared that acts of criminal syndicalism would no longer be practiced or sanctioned as a part of its program; but such evidence will not be held to have operated prejudicially against the defendants, where the testimony showing their guilt is overwhelming.

[8] ID.—MISCONDUCT OF COURT—IMPROPER REMARKS TO COUNSEL.—In this prosecution for a violation of subdivision 4 of section 2 of the Criminal Syndicalism Act, while some of the remarks of the court, which were directed toward counsel for defendants, and upon which defendants predicated a charge of misconduct by the court, should have been omitted, there was nothing in any of them which would justify the appellate court in holding that a jury of intelligent men and women would be influenced thereby in determining so serious a question as that of the guilt or innocence of persons charged with a public offense.

[9] ID.—SCIENTER—INSTRUCTIONS.—In such prosecution, although certain of defendants' requested instructions upon the subject of scienter or guilty knowledge, although not correctly phrased, might properly have been given, but it could not be said that the jury were not sufficiently enlightened upon the subject of knowledge by the instructions which were given.

[10] ID.—CONSPIRACY—CORRECT INSTRUCTION.—In such a prosecution, an instruction that "if you believe from the evidence beyond a reasonable doubt that the I. W. W. organization and its members was, at the time charged in the indictment, engaged in a conspiracy which had for its object the commission of the acts denounced by the criminal syndicalism statute . . . and . . . that such conspiracy, if conspiracy there be, on the part of the I. W. W. organization and its members, was still continuing, at the time charged in the indictment, not having yet accomplished its purpose, and if you further find that the defendants, or either of them, knowingly became members of the said I. W. W. organization, and continued such membership at the time charged in the

indictment, then I instruct you that by so knowingly becoming members of such organization, they thereby adopted and became conspirators, and it is your duty to return a verdict of guilty as charged," while not as specific as it should be, is not in any sense erroneous.

---

(1) 33 C. J., p. 165, sec. 25.   (2) 33 C. J., p. 165, sec. 25.   (3) 33 C. J., p. 166, sec. 26.   (4) 33 C. J., p. 166, sec. 26 (1926 Anno.). (5) 17 C. J., p. 332, sec. 3675; 33 C. J., p. 165, sec. 25 (1926 Anno.). (6) 33 C. J., p. 165, sec. 26.   (7) 33 C. J., p. 165, sec. 26.   (8) 17 C. J., p. 295, sec. 3637.   (9) 16 C. J., p. 1063, sec. 2506; 33 C. J., p. 165, sec. 25.   (10) 33 C. J., p. 165, sec. 25.

APPEAL from a judgment of the Superior Court of Sacramento County. Charles O. Busick, Judge. Affirmed.

The facts are stated in the opinion of the court.

R. W. Henderson for Appellants.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendants were jointly tried under an indictment found and presented to the superior court of Sacramento County by the grand jury of said county, charging them with the crime of "criminal syndicalism." The charge was based on subdivision 4 of section 2 of the Criminal Syndicalism Act. (Stats. 1919, p. 281. See, also, *People* v. *Roe*, 58 Cal. App. 690, 692 [209 Pac. 381] ; *People* v. *Wagner et al.*, 65 Cal. App. 704 [225 Pac. 464].) The jury found each of the defendants guilty as charged, and they have brought the case here by appeals from the judgments and the orders denying them a new trial.

The verdicts are assailed on the grounds that there is no evidence which affords them sufficient support; that errors of a highly prejudicial character were committed by the trial court in rulings admitting and excluding certain evidence; that the court, during the progress of the trial, was guilty of misconduct which seriously militated against the rights of the accused in the trial of the charge against them, and that certain instructions proposed by the defendants were erroneously and to the positive prejudice of the rights of the accused disallowed.

The record here, in so far as its evidentiary features are concerned, is quite familiar to this court. Books, pamphlets,

leaflets, magazines, and other periodicals containing and setting forth in elaborate detail the principles and policies of the Industrial Workers of the World and also containing dissertations and speeches by individuals upon the principles and ultimate aims thereof (all in the extreme commendatory and laudatory of the organization and its objects) were introduced in evidence and are in the record as it is presented to this court. This documentary evidence is in all substantial respects the same evidence of that character which has been introduced in every case involving the prosecution of the same crime against others which, in the last three years, has been appealed to and reviewed by the supreme and the appellate court of this state as we learn from the opinions in those cases. (See *People* v. *Steelik,* 187 Cal. 361 [203 Pac. 78]; *People* v. *Taylor,* 187 Cal. 378 [203 Pac. 85]; *People* v. *Roe,* 58 Cal. App. 690 [209 Pac. 381]; *People* v. *La Rue et al.,* 62 Cal. App. 276 [216 Pac. 627]; *People* v. *Flanagan et al.,* 65 Cal. App. 268 [223 Pac. 1014].) In the opinions in the cases just named, the principles and purposes of the organization, as disclosed by its literature introduced in evidence in said cases and in this, are sufficiently set out to make it clear that the ultimate end of said organization is to completely destroy the existing systems of governments of the United States and the states, and substitute therefor a sort of co-operative government or what the members of the organization denominate "a system of industrial democracy," the effect of the establishment of which would be to overthrow capitalism, and, to use plain terms, to destroy existing vested rights. To accomplish this radical result the organization proposes to take control of all machinery of industry, and all persons who work are to partake equally in the fruits of all industrial activities. The organization, so it is declared in its platform of principles, as the same is paraphrased by some of its members in magazines published by its authority "is not only industrial in form, but revolutionary in character," and is "based on the principle that 'the working class and the employing class have nothing in common' and that 'labor is entitled to all it produces.' " According to the same interpreters of its creed, the capitalists are thieves and parasites and their "sacred" property is plunder and "the state, church, press, and universities are tools of the exploiters," and that upon these institutions the mem-

bers of said organization "look with contempt." There are in the numerous magazines, books, and literature in other forms, all published and circulated by and under the authority of said organization, many details of how its great ultimate object can be accomplished. It is unnecessary to give these space herein. It is enough to say, generally, that the methods openly advocated by the organization, for overthrowing the capitalistic class, are, among others, to cause strikes, shirk the work to which the members may be assigned by employers and to do any other act which may discommode the employers or cause their enterprises to become unprofitable; that if any attempt be made by the capitalists to close down their industries or cease operating them because of the labor conditions thus brought about, then the members themselves shall refuse to cease working and, if necessary, take control of the industrial plants in which they may be employed and operate them.

The witnesses Townsend, Coutts, and Arada (the two first named ex-members of the said organization), each detailing the circumstances of crimes and other atrocities committed by members of the organization to further the ends thereof again appear in the instant case as witnesses for the prosecution. Their stories of the crimes committed (arson in particular) at various points in the San Joaquin Valley and other points in this and other states of the Union, in the years 1916, 1917, 1918, 1920, and some other crimes as late as the year 1922 by the members of the organization, and resulting in the destruction of many thousands of dollars worth of property, as given in this case, are familiar chapters in a number of the judicial opinions of the higher courts of this state. The purpose sought to be attained by the commission of those crimes was, according to these witnesses, in accord with the then established policy of the organization to create throughout the state a reign of terror, in the hope that thus the people—the producers, capitalists, and employers generally—would, if not actually yielding to or acquiescing in the ultimate demands or objects of that organization, be so instilled with fear and alarm and, indeed, utter helplessness against an enemy carrying on its criminal warfare with a cunning subtlety that challenged detection, that would induce them to offer a sort of "armistice" or a plan of compromise which

would operate only as a wedge for driving deep into our
soil the radical and revolutionary principles of government
for which that organization avowedly stands. It is unneces-
sary to repeat herein in detail the stories told by the wit-
nesses referred to. It is conceded by counsel for the defend-
ants that all the testimony in this case is substantially a
repetition of the testimony in the cases above named.

There can exist no ground for doubting that the testimony
thus referred to is amply sufficient to support the verdicts.
[1]   The defendants, proceeding upon the claim that, since
the commission of the offenses or the crimes concerning
which Townsend and Coutts testified, the organization had
entirely changed its policy for carrying out its ultimate ob-
jects, introduced a number of witnesses, either members of
the organization or former members thereof, who testified
that the executive board of the Industrial Workers of the
World had held a session at which were adopted resolutions
denouncing and proclaiming against the resort by the members
of the organization to the commission of acts of violence of
any character in furtherance of the purposes thereof. Docu-
mentary evidence was also introduced to the same effect.
Some of the witnesses for the defense testified that all liter-
ature containing either express or implied advocacy of acts
of sabotage or other criminal violence as the means for ac-
complishing the purposes of the organization had been de-
stroyed several years ago or subsequently to the passage of
the Criminal Syndicalism Act. They explained, however,
that the destruction of said literature was because the In-
dustrial Workers of the World did not desire to get into
trouble with the courts. They also testified that they had
never heard any member or members of the organization
advocate acts of sabotage or other crimes for the purpose of
carrying out the objects of the organization. Much of this
testimony is at positive variance from the testimony of
Townsend and Coutts, who stated that, while the literature
advocating criminal violence by the members of the organiza-
tion might have been destroyed at the time mentioned by
the witnesses for the defense, such act was merely a subter-
fuge and that it was understood among the members that
the same destructive policy should be pursued as it had al-
ways been by said organization. It was for the jury to
determine whether the testimony of the witnesses referred

to or the documentary evidence introduced involved a statement or representation of the truth.

[2] In the case of the *People* v. *Roe,* 58 Cal. App. 690 [209 Pac. 381], we declared that there is nothing, so far as we may judge from what on their face they purport to be, in the principles advocated by the Industrial Workers of the World which they are not at liberty to advocate. We still adhere to that declaration. In other words, we are not inclined to hold that, upon the face of its platform of principles, in advocating the practical application thereof, the Industrial Workers of the World are not within the rights guaranteed to all citizens by the federal and state constitutions. It is obvious, though, that the scheme proposed to be established by the organization for the government of society is wholly fanciful and impractical. It is, indeed, a paradoxical notion of government. It would seem to involve a recidivation to that primitive society in which might stood for right. The jury would be entitled to weigh these considerations, in connection with the testimony showing that violent methods had been resorted to by the organization, in determining whether the said organization had reformed or still believed in, advocated, taught and sanctioned such methods for establishing its propaganda.

The rulings as to the evidence and of which the defendants complain are very much of the same character as those considered in *People* v. *Wagner et al., supra.* A general reference to and consideration of these assignments will, therefore, be sufficient.

The specific claim as to certain testimony given by the witnesses Townsend and Coutts is that they, in explaining the operations of the organization, were permitted to express their opinions and conclusions. For instance, Townsend was examined in detail, in connection with the alleged acts of violence advocated by the organization, with regard to the meaning of certain words or terms or phrases employed by the members of said organization in expressing the various criminal acts which were perpetrated or to be perpetrated by them in effecting its purpose to create a general state of terrorism among the people, particularly employers. Among numerous other questions on these lines, he was asked if he knew what the members understood from the term "sab cat," to which he replied that it had reference to

those members who were engaged in committing acts of sabotage. He further testified that when property had been destroyed by members either by acts of sabotage or arson, the expression understood among the members was that the "cat had been turned loose." He was also asked what was understood by the members by the terms "scissorsbills" and "hijacking," and other terms wholly unintelligible to one not a member of the organization and who has not read its literature or heard those terms explained. "Scissors bills," as a part of the nomenclature of the organization, he explained, referred to members of labor unions, with whom the Industrial Workers of the World were as much at war as they were with the capitalistic class, because the labor unions necessarily recognize the rights of employers, and that "hijacking" referred to the robbery of "scissorsbills" or other persons not connected with the organization, a principle, so Townsend declared, which the organization fully indorsed as one of the means for disrupting labor organizations and creating terror among the people generally. [3] These and other statements, too numerous to mention specifically herein, relative to the methods adopted, practiced and advocated by the organization as in aid of the attainment of its paramount objects, constituted largely the testimony of the witnesses Townsend and Coutts which, as is the claim, involved the expression of the opinions and conclusions of those witnesses. Townsend and Coutts testified that all the information they had obtained as to the methods of the organization for forcing its propaganda upon the people and all that they knew as to the meaning of the various cryptic terms employed by the members in indicating acts of violence which had been and which were proposed to be committed was acquired while they were members of the organization and at meetings when the matters referred to were discussed and explained. We do not think that this testimony is subject to the objections urged against it. It is true that, now and then, the witnesses expressed their conclusions, but, considering their testimony as a whole, it cannot justly be said that the matters to which they testified did not constitute facts competent to be established in the case and pertinent to the issue. Naturally, in a case dependent for its establishment, as this is, upon the proof of certain political doctrines or

principles, it would not be surprising if a witness giving testimony regarding the scope and the designed effect of those principles would occasionally make a statement involving more or less of an opinion or a conclusion, but such an opinion or conclusion under such circumstances would and should be regarded as a statement of facts where made by one who has indorsed, habitually practiced, and followed said principles. Of course, a general commentary or dissertation upon the principles or doctrines, unless a defendant on trial was himself the author thereof, or unless shown to have been published or adopted by the organization itself, would not be admissible. [4] It may further be explained that the same objection is urged here against the testimony of the witness Townsend with regard to the principles advocated by the organization as they were set forth in a book purporting to have been published under the authority of the organization. The witness was shown the book and asked by the district attorney whether or not he could find therein any language indicating that "the I. W. W. holds the same sort of ideas that it formerly had." Several such questions based upon the book were propounded by the district attorney, objected to by the defendants and the objections overruled. As we understand the record, the witness, in response to those questions, merely read certain passages from the book to which his attention was called by the district attorney setting forth the principles of the organization and answered the questions in the affirmative. We can perceive no reason for holding that the testimony thus elicited was not competent. No question was raised as to the meaning of the passages read by the witness to the jury and it was proper for the latter to state whether or not the organization still adhered to the doctrines promulgated in said book to which his attention was directed by the district attorney.

Speaking generally of the character of the documentary evidence introduced in the case, it is to be remarked that, in a case of the character of the one before us, it would be difficult to present the theory of the people without securing from those who had been members of the organization, and who had made a study of the principles thereof, as Townsend and Coutts declared that they had, a statement as to what they understood to be the meaning and purpose of

those principles. Certainly such testimony by witnesses who admitted that they had been members of the organization and had participated in acts involving the practical application of the principles of the organization, would be competent and proper.

[5]   It is further contended that the testimony of Townsend to the effect that he had met and talked with other members of the organization when he was a member thereof and that they had told him that they had but recently committed the crime of arson, by setting fire to a number of buildings in the San Joaquin Valley, was hearsay and, therefore, incompetent. The attorney-general argues that this testimony was admissible upon the theory that the Industrial Workers of the World constituted a confederation or combination whose purpose was to accomplish its objects by unlawful or criminal means, and that it is a continuing conspiracy and will remain so until its ultimate objects are accomplished; that, therefore, any acts or declarations of any members of the organization regarding the criminal activities thereof, whensoever made, are admissible under the rule. But the point has been decided the other way by the cases. (See *People* v. *La Rue,* 62 Cal. App. 276 [216 Pac. 627] ; *People* v. *Flanagan,* 65 Cal. App. 268 [223 Pac. 1014], and the cases therein cited.) It must, therefore, be held that the admission of that testimony was error, but in view of the large quantity of incriminatory testimony presented against the defendants herein, we must conclude that, notwithstanding said error, a miscarriage of justice will not result therefrom.

[6]   It is contended that much of the literature introduced by the people and allowed by the court, advocating, at least by implication, acts of violence by its members, was irrelevant to the case because of having been published a long time anterior to the passage of the Syndicalism Act. Some of this literature was of "ancient vintage"—that is to say, published prior to the passage of said act. But it was published under the authority of the I. W. W. and, as stated, some of it advocated, though in an indirect way, the resort to unlawful activities to carry out its great central idea. This evidence was not irrelevant or incompetent. Whether the organization had subsequently to the publication of said literature receded from the policies therein advocated and

is now opposed to the employment of unlawful means for the achievement of its ends and aims, was a matter of defense; and, even upon the introduction of evidence by the defense designed and tending to show that the organization no longer advocated the method set out in the said literature as a part of its program to change our systems of government, it was for the jury to determine from all the evidence whether it had reformed its methods to accomplish its point, and, in thus considering the evidence, the jury, for the purpose of measuring its weight or probative value, were at liberty to and, we may assume, did take into account the fact that said literature had been published many years before the Syndicalism Act was passed. It is further to be assumed from the verdict that that fact did not in the minds of the jury detract any from the evidentiary significance of said literature.

There are several other assignments involving the same proposition as the one just considered. In reply to all such objections, we can say that no sound reason occurs to us why all the literature published by said organization and which is shown to contain authoritative statements and interpretations of its purposes, principles, policies, activities, and methods of accomplishing results, is not competent evidence in a prosecution under the Criminal Syndicalism Act, regardless of the time at which such literature was so published and issued. None of the literature of the organization received in evidence in this case showed or tended to show any other crime than that charged in the indictments, to wit: That the defendants became and were members of the organization with knowledge of its unlawful character. It follows, therefore, that the cases cited by counsel for the defendants, notably *People* v. *Glass,* 158 Cal. 650 [112 Pac. 281], are not in point.

The complaint that the court erroneously excluded certain evidence offered by the defense is without substantial merit. There are many of these assignments and we will not attempt to give them specific notice herein. It will be sufficient to say, generally, that much of the evidence offered by the defense and excluded by the court was incompetent in that it involved an attempt to prove the contents of certain writings by parol. The court permitted the defendants to introduce a large amount of evidence tending to show

that the organization, for some years last past, had renounced and condemned the policy which once it had advocated of pressing its principles to the accomplishment of its purposes by unlawful methods. Indeed, the court seemed to give the defense considerable latitude in the matter of the introduction of evidence tending to show that the organization had not for many years advocated or believed in the practice of criminal acts as in furtherance of its objects.

[7] The defense introduced in evidence an article contained in a magazine published in the year 1920 under the authority of the I. W. W., stating that said organization had adopted peaceable means for carrying out its objects and that it was unalterably opposed to the use of violence or criminal acts for its purposes. In rebuttal, to offset the effect of said article, the district attorney was permitted to introduce in evidence a list (published in the same issue of said magazine) of the members of the I. W. W. who had been arrested and charged with a violation of the Criminal Syndicalism Act, some being convicted, others acquitted and others as to whom indictments were dismissed, all these proceedings being inaugurated subsequent to the time at which, according to said magazine article, the organization declared that acts of criminal syndicalism would no longer be practiced or sanctioned as a part of its program. The ruling allowing that testimony was clearly erroneous. A man cannot be convicted of crime by proof of the fact that he had previously been convicted of or charged with a similar or some other crime. The fact that these men were arrested, prosecuted, and convicted or acquitted would not be competent proof that the organization continued to preach and practice acts of sabotage. But we cannot believe that the testimony operated prejudicially against the defendants. We doubt not that there was not a member of the jury trying the defendants here but that knew that since the date of the publication of the magazine referred to (in the year 1920) there had been many prosecutions and convictions under the Syndicalism Act in the state of California. At all events, the testimony of guilt in this case is so overwhelming that we cannot well say that a miscarriage of justice will result from the upholding of the verdicts herein, notwithstanding the error adverted to.

Certain misconduct on the part of the trial court is assigned. There is so large a number of specifications under this head that it would be impossible to notice all of them. The alleged misconduct occurred at different times during the trial and involved remarks of the court when ruling on objections to certain evidence. On one occasion, when counsel for the defendants was examining his own witness and endeavoring to keep him within the scope of the questions asked, the court, in effect, stated that greater progress would be made in the trial if the attorney for the defendant would take the witness-stand and let the defendant take the chair of the attorney. On another occasion the court, in the course of a discussion with the attorney for the defendant, relative to the admissibility of certain testimony, addressing the said attorney, said, "If you want to show the transactions of *your* organization why it is your duty to present the best evidence of it." It is further complained that the court, in ruling upon an objection to the cross-examination of one of the witnesses for the defense (a member of the organization) as to a certain provision of the constitution of the I. W. W., said: "That portion of the constitution was read in evidence by Mr. Cowan (assistant district attorney) this morning which provides that the official literature shall bear or carry the seal of the organization." It is also claimed that the court prejudiced the rights of the defendants by unjustifiably rebuking one of the attorneys for the defense. The incident arose as follows: One of the witnesses for the defense was testifying as to the form of an application for membership of the organization and upon being shown by the district attorney a blank form purporting to be such an application, identified the same as the ordinary form of application. He was then asked some other questions concerning the application, when the attorney for the defendants objected to further examination with reference thereto on the ground that the witness had failed to identify it as the official form of application. The witness interrupted and said, "Well, your Honor, I did not fail to identify it. I absolutely do identify it," to which counsel for the defendants remarked, "I suppose the witness wants to correct his answer," and the witness replied, "No corrections." After further discussion, the attorney for the defendants stated: "I note an exception to the remark of

the court as intimating that I have deliberately misstated a statement of the witness," to which the court replied, "You are mistaken. The court did not intimate anything. The court means just what it said, and does not mean anything else but what it did say, and does not intimate anything else."

[8]  The above constitute the principal grounds upon which it is urged that the court was guilty of misconduct which seriously prejudiced the rights of the accused. The court should have omitted some of the remarks referred to; but we see nothing in any of them which would justify this court in holding that a jury of intelligent men and women would be influenced thereby in determining so serious a question as that of the guilt or innocence of persons charged with a public offense.

[9]  The next and the last consideration will be as to the complaint that the court erred in giving and refusing to give certain instructions. The defense proposed an instruction upon the question of scienter which was considered in the case of *People* v. *Wagner et al., supra,* and therein it was held that said instruction was not wholly a correct statement of the law and that the court, having elsewhere in its charge, as it did in this case, given two instructions which, rationally construed, as presumptively they were so construed and understood by the jury, was not required to accept the instruction proposed by the defendant and give it to the jury after so modifying it as to make it conform to a correct statement of the law. We held in the Wagner case, following the case of the *People* v. *Flanagan, supra,* that scienter or guilty knowledge was an essential element of the offense charged in the indictment there and we reaffirm our adherence to the conclusion so reached. The court here, as in the Wagner case, read the section of the Criminal Syndicalism Act upon which the indictment here is predicated and also gave another instruction in which it was plainly stated that persons charged under that section of the act must be shown to have knowingly joined or become members of the organization and by this it was intended to be said, as the instruction certainly must be construed to mean, that "knowingly" meant guilty knowledge or knowledge of the unlawful character of the organization when they became and remained members

thereof. The court also gave an instruction proposed by the defendants which was to the effect that evidence as to certain acts done and declarations made by certain members of the Industrial Workers of the World should be considered solely for the purpose of enabling the jury to determine whether the said organization was organized "to teach, practice, advocate, or aid and abet criminal syndicalism, as that term has elsewhere been defined to you in these instructions." This instruction was clearly founded upon the theory that the gist of the offense was in the means by which the said organization proposed to carry out its objects and it seems to us would necessarily imply that persons, to be guilty of the offense charged, must have had knowledge, when becoming members or remaining such, of the criminal methods advocated by the organization. The court, however, did reject the following instruction proposed by the defense: "The word 'knowingly,' as used in this indictment, means knowing the Industrial Workers of the World was organized for the purposes charged in the indictment." This instruction could and should have been phrased in such language as to have made the proposition therein declared more complete or as the statute itself defines the crime of criminal syndicalism; but it would not have been improper to give it in its present form. We do not think, however, in view of the entire record and the abundance of proof of guilt, that a miscarriage of justice has resulted or will result from the verdicts by reason of the refusal of the court to accept and give said instruction. In fact, we cannot persuade ourselves that the jury were not sufficiently enlightened upon the subject of knowledge by the instructions given. It will be borne in mind that the court in this case did not, as in the case of *People* v. *Flanagan,* orally interpret to the jury, contrary to what we conceive to be the proper meaning and intent of subdivision 4 of section 2 of the Criminal Syndicalism Act, the written instructions given upon the subject of scienter or guilty knowledge.

[10] It is further contended that the court erred in giving the following instruction, the claim being that it does not contain a correct statement of the law of the case: "You are instructed that if you believe from the evidence beyond a reasonable doubt that the I. W. W. organization and its

members was, at the time charged in the indictment, engaged in a conspiracy *which had for its object the commission of the acts denounced by the criminal syndicalism statute of this state* and which I have read to you, and if you further believe from the evidence beyond a reasonable doubt that such conspiracy, if conspiracy there be, on the part of the I. W. W. organization and its members, was still continuing, at the time charged in the indictment, not having yet accomplished its purpose, and if you further find that the defendants, or either of them, knowingly became members of the said I. W. W. organization, and continued such membership at the time charged in the indictment, then I instruct you that by so knowingly becoming members of such organization, they thereby adopted and became co-conspirators, and it is your duty to return a verdict of guilty as charged.''

The above instruction is not as specific as it should be, but we are unable to see that it is in any respect erroneous. It in a very general way states the law correctly. Certainly if any person became a member of and engaged in a conspiracy which had for its object the commission of the acts *denounced* by the criminal syndicalism statute of this state—that is, to engage in advocating, teaching, or aiding and abetting criminal syndicalism as the same is defined by section 1 of said act—he would be guilty of the crime charged in the indictment. The court in this case gave several instructions correctly explaining the essentials of the crime of conspiracy.

We have now considered, in a very general way, it is true, the more important points urged for a reversal. It cannot be denied that in a number of instances the court committed error in the reception and exclusion of evidence; but, viewing the record as a whole, and accepting the evidence, as we must, at its face value, we are unable to persuade ourselves that from any errors committed in the trial of the case a miscarriage of justice has been or will be the consequence of the verdicts returned.

We may with propriety take occasion to remark that in the trial of cases of this character the judge presiding and the district attorney prosecuting should exercise the most circumspect care in the matter of the presentation of evidence to support the charge preferred against the accused. The defendants in a criminal syndicalism prosecution are

entitled to the same fair and impartial trial as are persons charged with any other offense known to the law. Nothing should be brought into the record, either by way of side remarks or upon any unsupported pretext whatsoever, which is not relevant and competent and calculated to aid in a just determination of the ultimate question of the guilt or innocence of the accused. It should also at all times be borne in mind that section 4½ of article VI of the constitution was never intended as a shield for the torturing of the rules of evidence. These rules are the same to-day as they have always been and they alone should be the guide in the trial of all cases whether criminal or civil. These remarks are addressed to all judges and district attorneys trying cases of a similar character.

For the reasons herein given the judgment and the order as to each of the defendants are affirmed.

Plummer, J., and Finch, P. J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 24, 1924.

All the Justices concurred.