[Crim. No. 714. Third Appellate District.—January 14, 1924.]

THE PEOPLE, Respondent, v. WILLIAM FLANAGAN et al., Appellants.

[1] CRIMINAL SYNDICALISM ACT—PURPOSES OF I. W. W.—PRESUMP-
TION OF KNOWLEDGE—INFERENCES—EVIDENCE.—The general character and purposes of the I. W. W. have been given such wide publicity that it is reasonable to assume, in the absence of evidence to the contrary, that any person of mature judgment and understanding is possessed of sufficient knowledge thereof to put him upon inquiry at least as to the nature of the organization; and in a prosecution for a violation of the Criminal Syndicalism Act (Stats. 1919, p. 281), proof of the membership of the defendants in the I. W. W. is sufficient to justify the inference that the defendants had knowledge of the purposes of that organization.

[2] ID.—KNOWLEDGE OF PURPOSES—EVIDENCE.—In a prosecution for a violation of the Criminal Syndicalism Act, knowledge of the purposes of the I. W. W. is an essential element of the crime; and, while the jurors are not required to believe the testimony given by the defendant to prove his lack of knowledge of the character and purposes of the organization, the defendant has the right to have such testimony considered by them.

[3] ID.—MISTAKEN BELIEF AS TO PURPOSES.—While every person is presumed to know the law, and ignorance thereof is no defense to a charge of crime, ignorance of the character and purposes of the I. W. W. is not ignorance of the law, but of a fact, and a person not guilty of culpable negligence may not be punished for merely agreeing to further the purposes of that organization, if he is honestly mistaken as to the nature of such purposes.

[4] ID.—COMMISSION OF CRIMINAL ACTS—HEARSAY STATEMENTS.— In a prosecution for a violation of the Criminal Syndicalism Act, hearsay statements not made at any meeting of the I. W. W., or to or by an officer or representative thereof, or in the way of propaganda to further its purposes, are erroneously admitted in evidence for the purpose of proving the commission of criminal acts by its members.

[5] ID.—EVIDENCE—OPINIONS AND CONCLUSIONS.—In a prosecution for a violation of the Criminal Syndicalism Act, while the prosecution must of necessity rely upon the testimony of criminals to prove the character and purposes of the I. W. W., such witnesses should be held strictly to a statement of facts, to the exclusion of mere opinions and conclusions.

[6] ID.—UTOPIAN IDEAS OF I. W. W.—IRRELEVANT EVIDENCE.—In a prosecution for a violation of the Criminal Syndicalism Act, it is error to permit an ex-member of the I. W. W. to testify that in the Utopia of industrial and political perfection which is proposed to be established by that organization there will be no homes, that children will be taken from their mothers at the age of two and a half years and will be given but three or four years' schooling, that men's farms will be taken away from them and they will become workers, as will the owners of "small business houses," that there will be no marriage relation, but "free love" will be the rule, that jails and penitentiaries will be abolished, that there will be no churches, "as religion is the greatest enemy that the radical movement has," that courts will be abolished and the men in prisons and jails will be released, and that "the I. W. W. terms themselves as on an equal footing with Christ. . . . They say the only difference between the I. W. W.'s of to-day and Christ is that he rode a jackass and they ride freight trains, . . . that religion is a sham to keep

people in ignorance; ... The I. W. W. call Jesus Christ 'Jerusalem Slim.'"

[7] ID.—OBJECTS OF I. W. W.—MEANS ADOPTED.—However beneficent the ultimate object of an organization, such as the I. W. W., may be, the conspiracy is criminal if it advocates the accomplishment thereof by "unlawful acts of force and violence or unlawful methods of terrorism," and however baneful the ultimate object, the law does not make criminal the advocacy thereof if peaceful means only, such as are sanctioned by our constitution and laws, are employed.

[8] ID.—CHARACTER OF SYSTEM TO BE ESTABLISHED.—The character of the system to be established by the I. W. W. is immaterial in the trial of a case arising under the Criminal Syndicalism Act.

[9] ID.—ARGUMENTATIVE LITERATURE.—In a prosecution for a violation of the Criminal Syndicalism Act, literature composed largely of arguments in defense of the I. W. W. and in condemnation of the prosecution of members thereof is properly excluded as evidence. If any portions of such literature are admissible, they should be offered separately.

[10] ID. — MISCONDUCT OF COURT — PREJUDICIAL STATEMENT — INSTRUCTIONS.—In such a prosecution, a statement by the court, made in the presence of the jury in sustaining an objection to a piece of literature offered by defendants, but which was not read to the jury, that "I think it is nothing but a treasonable article. It isn't the truth. The statement here is not the truth, and I think it is really unbecoming of anybody to offer such an article in defense of anyone. The very statement in there is a conglomeration of falsehoods and treasonable in itself," constitutes prejudicial misconduct, and the prejudicial effect of such statement is not removed by an instruction to the jury, at the request of defendants, to disregard same.

APPEAL from a judgment of the Superior Court of Sacramento County. Charles O. Busick, Judge. Reversed.

The facts are stated in the opinion of the court.

R. W. Henderson and T. F. Allen for Appellants.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

FINCH, P. J.—The defendants were jointly charged with being members of the Industrial Workers of the World, in violation of the Criminal Syndicalism Act. (Stats. 1919,

p. 281.)  They were jointly tried.  Flanagan and Stagland
were convicted and the other defendants, three in number,
were acquitted.  The convicted defendants moved for new
trials, and their motions were denied.  They were thereupon
sentenced to imprisonment in the state prison for the terms
provided by law, not less than one nor more than fourteen
years.  They have appealed from the judgments of convic-
tion and the orders denying their motions for new trials.
The appeals are prosecuted on a single record.

Admittedly the defendants were all members of the
I. W. W.  The evidence was sufficient to show the criminal
character of the organization.  It was similar to that in the
many cases heretofore reviewed on appeal and no useful
purpose would be served by setting it out in this opinion.
It is urged that the evidence is insufficient to establish
knowledge on the part of the defendants of the criminal
character of the organization.  The only evidence tending to
connect the defendants with the criminal conspiracy is the
mere fact of their membership.  Persons, however, do not
usually join an organization without some knowledge of its
character and purposes.  [1] The general character and
purposes of the I. W. W. have been given such wide pub-
licity, as shown by the evidence, that it is reasonable to
assume, in the absence of evidence to the contrary, that any
person of mature judgment and understanding is possessed
of sufficient knowledge thereof to put him upon inquiry at
least as to the nature of the organization.  The intent of the
defendants must be determined from their voluntary connec-
tion with the conspiracy, viewed in the light of the circum-
stances which they knew or ought to have known.  It must
be held that the evidence is sufficient to justify the inference
that the defendants had knowledge of the purposes of the
organization.

[2]  It was the theory of the prosecution and of the trial
court that it was not necessary, in order to convict, for the
jury to find that the defendants had any knowledge of the
character of the organization.  The defendant Flanagan
testified that he was born July 18, 1902; that on the 27th of
November, 1922, a man on the street showed defendant a
membership card and asked him if he wanted to join the
organization, informing defendant that it is "a labor organ-
ization"; that the defendant thereupon gave the man two

dollars and fifty cents and was handed a membership card; that he never knew of such an organization prior to that time and had never had any experience with members thereof; that he had never heard that ''any of the purposes announced in the preamble were to be carried out by the use of force and violence.'' He was then asked, ''Did you have such an understanding, that that was the plan or scheme of the Industrial Workers of the World, when—'' The court then interrupted counsel for defendant and said: ''Well, that is immaterial, whether he has or not; if he is a member, and the organization is one organized for the purposes of doing the things prohibited by statute, it doesn't make any difference what he understands.'' Stagland did not take the witness-stand. It would have been futile for him to have attempted to prove want of guilty knowledge after the ruling mentioned. The court refused to instruct the jury that proof of knowledge by defendants of the character of the organization was essential to a conviction. One of the proposed instructions upon the question of such knowledge is faulty in stating that to justify a conviction the jury must find that ''the Industrial Workers of the World was organized in the County of Sacramento.'' The other instruction upon that question, which the court refused, correctly states the law. After the jurors had retired to deliberate they returned into court and the foreman inquired: ''If the jury finds that a man joins an organization, and was stopped from investigating it very much before he became fully cognizant of what the organization was, and, in fact, the jury believes that he would have repudiated it had he known it was a criminal syndicate, should the jury take that evidence into consideration?'' The court replied: ''It is not necessary, and the law does not require, that the prosecution establish that he knew the character of the organization. . . . It does not require that they know the character of the organization when they join it. . . . The word 'knowingly' there means that he must know that he joined the organization. If he was under the influence of some kind of a narcotic, and didn't know what he was doing, or was insane, then he would not knowingly join it; but if he knew that he joined the organization, and if you find that it is a criminal organization, that is all that the law requires to be established.'' From the foregoing it is clear that the

court not only ruled out testimony tending to show want of
guilty knowledge, but instructed the jury that guilty knowl-
edge is not an essential element of the offense charged.
Flanagan became a member, in the manner stated, on the
27th of November, 1922. He was arrested the following
day while on the picket line with some Hetch Hetchy strike
bulletins in his possession. He was taken before the police
judge three days later and discharged. He was again ar-
rested on the second day of December and was thereafter
confined in jail until the time of the trial. There was no
advocacy of crime or violence contained in the strike
bulletin. While the jurors were not required to accept as
true the testimony given by the defendant, he had the right
to have the same considered by them.

It is argued that the intent of a defendant is not an
element of the crime denounced by the Criminal Syndicalism
Act, but that the statute makes a violation of its terms a
crime regardless of intent. The contention finds support in
the cases of *State* v. *Hennessy,* 114 Wash. 351 [195 Pac.
211], and *State* v. *Laundy,* 103 Or. 443 [204 Pac. 958,
206 Pac. 290]. In *Matter of Application of Ahart,* 172 Cal.
762 [159 Pac. 160], the petitioner was charged under an
ordinance prohibiting the transportation of intoxicating
liquor "to any place, the establishing or keeping of which is
prohibited by this ordinance." It was contended that "the
ordinance itself would make guilty of crime any person who,
without knowledge of the character of the place and without
intent to violate the law, innocently and in ignorance of
the character of the place transported to it forbidden
liquors." The court said: "We do not construe section 5 of
the Covina ordinance as designed to inflict punishment upon
an innocent person who shall so transport intoxicants. The
case comes quite clearly within the reasoning and principles
of the English case of *Regina* v. *Tolson,* L. R. 23 Q. B. Div.
168 (1889), S. C. 40 Alb. L. J. 250. . . . The case was a
criminal charge against a woman for a bigamous marriage.
. . . The woman had married five years instead of seven
years after her husband's desertion of her, under the belief
held in good faith that her husband was dead. The proposi-
tion considered was whether honest belief and good faith
constituted a defense. It was conceded that the prisoner
'falls within the very words of the statute.' Cave, J., said:

'At common law an honest and reasonable belief in the existence of circumstances, which, if true, would make the act for which the person is indicted an innocent act, has always been held to be a good defense. . . . So far as I am aware it has never been suggested that these exceptions do not equally apply to the case of statutory offenses unless they are excluded expressly or by necessary implication.' "
The contention here made need be examined only in relation to the crime charged. The act provides that "any person who . . . is . . . a member of any organization, society, group or assemblage of persons organized or assembled to advocate, teach or aid and abet criminal syndicalism . . . is guilty of a felony." The defendants were, in effect, charged with conspiring "to advocate, teach or aid and abet criminal syndicalism." (*People* v. *Steelik,* 187 Cal. 361, 376 [203 Pac. 78]; *People* v. *La Rue,* 62 Cal. App. 276 [216 Pac. 627, 629].) A criminal conspiracy is a partnership in criminal purposes and is constituted by an agreement, though, of course, the agreement need not be formal. (*United States* v. *Kissel,* 218 U. S. 601 [54 L. Ed. 1168, 31 Sup. Ct. Rep. 124, see, also Rose's U. S. Notes].) Every person who joins a conspiracy after it is constituted comes into it by a like agreement on his part. The conspiracy here charged is complete without the commission of an overt act. Since the mere agreement is punishable, no reason appears why the rules applicable to civil contracts should not apply. One of the essentials of a civil contract is that the consent of the parties must be free. (Civ. Code, sec. 1565.) "An apparent consent is not real or free when obtained through . . . mistake." (Civ. Code, sec. 1567.) [3] It would be a harsh rule which would punish a defendant, not guilty of culpable negligence, for merely agreeing to further a purpose, if he is honestly mistaken as to the nature of the purpose. Every person is presumed to know the law, and ignorance thereof is no defense to a charge of crime, but the defense here sought to be shown is not ignorance of the law, but of a fact. In a case where the defendants were charged with conspiracy to obstruct the administration of justice it is said: "Undoubtedly it is a condition of penal laws that ignorance of them constitutes no defense to an indictment for their violation, but that rule has

no application here.  The obstruction of the due administration of justice in any court of the United States, corruptly or by threats or force, is indeed made criminal, but such obstruction can only arise when justice is being administered. Unless that fact exists, the statutory offense cannot be committed, and while, with knowledge or notice of that fact, the intent to offend accompanies obstructive action, without such knowledge or notice the evil intent is lacking.  It is enough if the thing is done which the statute forbids, provided the situation invokes the protection of the law, and the accused is chargeable with knowledge or notice of the situation; but not otherwise."  (*Pettibone* v. *United States,* 148 U. S. 197 [37 L. Ed. 419, 13 Sup. Ct. Rep. 542, see, also, Rose's U. S. Notes].  See, also, *United States* v. *Milburn,* 288 Fed. 573; *Harrington* v. *United States,* 267 Fed. 97; *United States* v. *Jenks,* 258 Fed. 763; *United States* v. *McHugh,* 253 Fed. 224; *Buchanan* v. *United States,* 233 Fed. 257 [147 C. C. A. 263]; *Salla* v. *United States,* 104 Fed. 544 [44 C. C. A. 26]; *Ford* v. *United States,* 12 Ariz. 23 [94 Pac. 1102]; *State* v. *Cole* (Del.), 114 Atl. 201; *State* v. *Gregory,* 93 N. J. L. 205 [107 Atl. 459]; *People* v. *Lloyd,* 304 Ill. 23 [136 N. E. 505]; *State* v. *Stewart,* 59 Vt. 273 [59 Am. Rep. 710, 9 Atl. 559]; *State* v. *Crowley,* 41 Wis. 271 [22 Am. Rep. 719].)  The intention of the parties to an agreement is not only an essential element, but the most important element thereof.  This is true of an agreement of conspiracy.  "Joint evil intent is necessary to constitute·the offense.  'The confederation must be corrupt.  This is implied in the meaning of the term conspiracy.' "  (Wharton's Criminal Law, 11th ed., sec. 1606.) "The formation of a common design by two or more persons is never simpliciter a criminal conspiracy. . . . In many cases the inference (of criminal intent) would be irresistible; in others the jury might find that, although the object of the agreement and the overt act were ·unlawful, nevertheless, the parties charged acted under a misconception or in ignorance, without any actual criminal motive.  If that conclusion should be reached by the jury, then, whatever other criminal penalties the parties might have incurred, the crime of conspiracy would not have been established."  (*People* v. *Flack,* 125 N. Y. 324 [11 L. R. A. 807,

26 N. E. 267].) In the case of *People* v. *Lloyd, supra,* where a conviction under the criminal syndicalism law of Illinois was involved, the court said: "The criminal quality of the common design of two or more persons resides in the intention of the parties to the agreement, construed in connection with the purpose contemplated, and as the accused may deny any criminal intent, the question of intent becomes one of fact. The question of intent, therefore, cannot be ruled as a question of law, but must be submitted to the jury." While the question under consideration has not been expressly decided by the higher courts of this state, it may be implied from the opinion in the case of *People* v. *Steelik,. supra,* that knowledge of the purposes of the organization is an essential element of the crime here charged. It is there said that "there was . . . evidence before the jury that the defendant . . . knowingly belonged to a conspiracy to commit crimes".; that it was alleged "that the defendant was a member of the I. W. W., knowing its alleged purposes"; that "the testimony as to his statements and activities were admissible to show his knowledge of and sympathy with the purposes of the organization"; and that the evidence justified the conviction of the defendant "in that he knowingly belonged to an organization which in its nature was a criminal conspiracy."

[4] Hearsay evidence, of a character similar to that held to have been erroneously admitted in the case of *People* v. *La Rue, supra,* being declarations of past acts, was admitted over the objections of defendants. In *People* v. *Irvin,* 77 Cal. 494, 504 [20 Pac. 56, 59], it is said: "Declarations showing past acts, or expressing merely the opinion or desire of the conspirator making them, are not binding upon anyone except himself, or those in whose presence they are made." For other authorities to the same effect, see *People* v. *Smith,* 151 Cal. 619, 626 [91 Pac. 511] , *State* v. *Dingham,* 37 Idaho, 253 [219 Pac. 760] , *State* v. *Gibson,* 115 Wash. 512 [197 Pac. 611], *State* v. *Pettilla,* 116 Wash. 589 [200 Pac. 332], and *State* v. *Kowalchuk,* 116 Wash. 592 [200 Pac. 333]. The hearsay statements erroneously admitted were not made at any meeting of the organization, or to or by any officer or representative thereof, or in the way of propaganda to further its purposes, but the facts sought

to be proved by the declarations were the commission of criminal acts by its members.

[5] Appellants contend that witnesses for the prosecution were permitted to give their opinions and conclusions as to the character and purposes of the I. W. W. One of the principal witnesses for the prosecution testified that he joined the organization in the year 1908, when he was nineteen or twenty years of age, and remained a member for six months; that he was again a member for six months in 1911; that he joined again on the twenty-second day of July, 1916, and remained a member until July, 1922; that from 1916 to 1920 he traveled through many states and actively participated in many cowardly crimes to further the purposes of the organization, such as malicious damage to machinery; putting emery dust in bearings; placing pieces of iron in shocks of grain to damage threshing-machines; "jabbing the horses with a pitch-fork and making them run away and tear up the wagon"; perforating air-tight cans containing meat, being packed for the use of the American soldiers in France, to "cause ptomaine poisoning"; and frequently robbing laborers who were not members of the organization, at the point of a gun. In the year 1919 the witness forsook his wife and child and clung to the organization. He testified: "I left my wife and child for the I. W. W. She told me to give her up or give the I. W. W. up, . . . and in June, 1919, I took two suitcases of literature . . . and went down into Kansas, and I returned back up into Nebraska, and worked with the organization the rest of the year. . . . I voluntarily quit the organization in the month of October or November, 1920. I quit the organization in principle. I quit believing in the organization, and I quit, and I continued my membership until including the month of July, 1922. . . . I just reformed, the same as any criminal would reform." The reformation of the witness, like the reformation which the defendants claim took place in the organization itself, followed closely upon the enactment of stringent criminal syndicalism laws in many of the states and vigorous prosecutions thereunder. These facts may be mere coincidences or they may tend to support the old-fashioned doctrine that the commission of crime is more effectively prevented

by punishment than by coddling criminals. There is no intention here to imply that the reformation of the witness was not real and sincere or that his testimony was not given under "the whip of his own repentance," as these were questions for the exclusive determination of the jury, but such a witness should be held strictly to a statement of facts, to the exclusion of mere opinions and conclusions. In many cases the prosecution must of necessity rely upon the testimony of criminals, but in such cases there should be a rigid adherence to the rules governing the admission of evidence. It appears from a reading of the testimony of the witness that the complaint of appellants is not without foundation.

[6] The same witness was permitted to testify that in the Utopia of industrial and political perfection which is proposed to be established by the I. W. W. there will be no homes; children will be taken from their mothers at the age of two and a half years and will be given but three or four years' schooling; men's farms will be taken away from them and they will become workers, as will the owners of "small business houses"; there will be no marriage relation, but "free love" will be the rule; jails and penitentiaries will be abolished; there will be no churches, "as religion is the greatest enemy that the radical movement has"; courts will be abolished and the men in prisons and jails will be released; "the I. W. W. terms themselves as on an equal footing with Christ. . . . They say the only difference between the I. W. W.'s of to-day and Christ is that he rode a jackass and they ride freight trains, . . . that religion is a sham to keep people in ignorance; . . . The I. W. W. call Jesus Christ 'Jerusalem Slim.' " In the foregoing testimony there is not a single fact material to any issue being tried, but every juror could find something therein appealing to his prejudices. There are many law-abiding citizens in this country who do not believe in the divinity of Christ—persons of other religious faiths, as well as some "modernist" Christians—but it is not proper to admit evidence of such lack of faith as tending to establish a charge of crime against one of them. The defendants were not on trial for their or other conspirators' moral or religious beliefs or for the character of the industrial and political scheme which the

organization proposes to establish, but for the unlawful means to be advocated and employed by the conspiracy in effecting its ultimate object. [7] However beneficent that object may be, the conspiracy is criminal if it advocates the accomplishment thereof by "unlawful acts of force and violence or unlawful methods of terrorism," and however baneful the ultimate object, the law does not make criminal the advocacy thereof if peaceable means only, such as are sanctioned by our constitutions and laws, are employed. The admission of the foregoing evidence was error. It was proper for the prosecution to prove that the organization proposes to accomplish an industrial and political change, but such purpose is shown by practically every piece of I. W. W. literature admitted in evidence, and no member or witness has ever denied that the organization advocates making a change. [8] The character of the system to be established is immaterial in the trial of a case arising under the act.

[9] The court permitted the defendants to introduce certain I. W. W. literature tending to show that the means advocated by the organization were lawful. Other literature offered by them was rejected. That rejected was composed largely of arguments in defense of the organization and in condemnation of the prosecution of members thereof and was properly excluded. If any portions thereof were admissible, such portions should have been offered separately.

[10] It is urged that the court was guilty of prejudicial misconduct in the following statement made in the presence of the jury in sustaining objection to one piece of literature offered by the defendants, but which was not read before the jury: "I think it is nothing but a treasonable article. It isn't the truth. The statement here is not the truth, and I think it is really unbecoming of anybody to offer such an article in defense of anyone. The very statement in there is a conglomeration of faleshoods and treasonable in itself." At the request of counsel for defendants the court instructed the jury to disregard the statement. In view of the fact that the character of the organization which issued the literature in question was an issue in the case, it is doubtful whether any instruction to the jury could have removed the prejudicial effect of the statement.

The other alleged errors will probably not occur in the retrial of the case and need not be specifically noticed.

The judgments and the orders are reversed.

Plummer, J., and Hart, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 14, 1924.