[Crim. No. 814. Third Appellate District.—March 4, 1925.]

## THE PEOPLE, Respondent, v. HENRY POWELL et al., Appellants.

[1] CRIMINAL LAW—CRIMINAL SYNDICALISM—MEMBERSHIP IN I. W. W.—KNOWLEDGE—IDENTITY OF DEFENDANTS—EVIDENCE.—In a prosecution of several defendants charged with the crime denounced by subdivision 4 of section 2 of the Criminal Syndicalism Act, cards showing membership of the defendants in the Industrial Workers of the World and also certain "credentials" purporting to have been issued by said organization and to confer upon defendants the authority to discharge certain duties with the promotion of the aims of the organization constitutes sufficient evidence to warrant the jury in concluding that the defendants were members of that organization and that they had knowledge of the principles, doctrines, purposes, and policies of the organization; and where the evidence of the arresting officers shows that such writings were taken from each of the defendants and that the names thereon correspond to the names of the defendants, it is immaterial that such officers cannot state from which of the defendants a particular card or credential was

taken, but it is for the jury to determine whether the cards and credentials were issued respectively to the defendants whose names they bear.

[2] ID.—ABSENCE OF MEMBERSHIP CARD—EVIDENCE.—In such prosecution, the jury is justified in drawing the conclusion that one of the defendants was a member of the Industrial Workers of the World where, although no membership card in such organization was found upon his person, it is shown that he was arrested with the other defendants while they were sitting at a table upon which there were at the time certain documents or writings, purporting to be the minutes of a meeting of the local branch and a record of the activities of certain members of the organization, in which the name of said defendant appeared in connection with the activities of certain committees and as a duly appointed traveling delegate to the local branch of the organization, and from which it further appeared that he had issued credentials to another member authorizing him to accept applications for membership of the local branch and to collect dues, and there was no denial, at the time of the arrest of defendants, that the place where the arrest was made was not the headquarters of the local branch of the organization, nor is it denied that said documents and writing were not what they purported to be, and it is conceded that literature in various forms found at the place was printed and published by and under the authority of said organization.

[3] ID.—TEACHINGS AND PRACTICES OF I. W. W.—TIME—EVIDENCE.— In such prosecution there is no merit in the contention that the evidence is insufficient to justify the implied finding of the jury that the Industrial Workers of the World taught, advocated, and practiced acts of criminal syndicalism to further its purposes, where there is introduced in evidence books, booklets, pamphlets, magazines, newspapers, and other periodicals taken from the local headquarters of that organization showing that at an earlier date the organization was guilty of committing the proscribed acts and there is also testimony, oral and documentary, other than that afforded by said literature, which shows or tends to show that the organization, after the passage of the Syndicalism Act in 1919, did not cease teaching and advocating its radical doctrines and continued after that time to advocate a resort to unlawful means for accomplishing its ultimate objects.

[4] ID.—PRACTICES PRIOR TO SYNDICALISM STATUTE—COMPETENT EVIDENCE.—In such prosecution, testimony relating to the teachings and practices of the Industrial Workers of the World before the

2.  See 23 Cal. Jur. 1120.
4.  See 23 Cal. Jur. 1117.

passage of the syndicalism statute is competent for the purpose of showing the unlawful character of the organization.

[5] ID.—REFORMATION OF ORGANIZATION—CONFLICTING EVIDENCE—VERDICT—APPEAL.—In such prosecution, in view of the evidence introduced by the prosecution, evidence introduced on behalf of the defense for the purpose of showing that, since the Criminal Syndicalism Act became a law, the Industrial Workers of the World had repeatedly, through its official publications and its lecturers, vigorously condemned the employment of violence or the resort to criminal acts or instrumentalities for effectuating its ultimate purposes and had strictly enjoined its members against the commission of crime or acts of lawlessness for any purpose, only creates a substantial conflict upon the question of the character of the organization—whether its methods of prosecuting its scheme to success are unlawful or such as are denounced by the Criminal Syndicalism Law; and the judgment of the jury upon that issue cannot legally be superseded by that of the appellate court.

[6] ID.—EXTRAJUDICIAL ADMISSIONS OF OFFICER—ATTITUDE OF ORGANIZATION—EVIDENCE.—In such prosecution, testimony of extrajudicial admissions of an officer of a local branch of the Industrial Workers of the World of atrocities committed in the past by members of that organization, in pursuance of its teachings and with its indorsement, is competent testimony as in proof of the unlawful character of the organization, particularly where such extrajudicial admissions involved an expression of the then present attitude of the organization as to the methods it believed in and advocated to accomplish its aims.

[7] ID.—CONTENTS OF LETTERS—PAROL EVIDENCE.—In such prosecution, it is not error to permit the prosecution to prove by parol the contents of letters which the witness stated he last saw and read in the hall of a certain branch of the Industrial Workers of the World where, when objection to such testimony was made, the district attorney stated that he did not have the letters in his possession and asked the attorney for the defendants if he had possession of them, to which the latter responded that he did not have any such letters, but that if he had them in his possession he would not deliver them to the district attorney.

(1) 33 C. J., p. 165, n. 93, 96. (2) 16 C. J., p. 741, n. 38; 33 C. J., p. 165, n. 93. (3, 4) 33 C. J., p. 165, n. 93, 3. (5) 17 C. J., p. 264, n. 88, 89. (6) 33 C. J., p. 166, n. 9. (7) 16 C. J., p. 616, n. 87, 89.

APPEAL from a judgment of the Superior Court of Humboldt County. Warren H. Tryon, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

R. W. Henderson for Appellants.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendants were jointly charged with and tried for and convicted of the crime of criminal syndicalism in the superior court of Humboldt County. Each made a motion for a new trial and the same was denied and each appeals from the judgment of conviction and the order denying him a new trial.

The offense with which the accused are charged and of which they were convicted is that so denounced by subdivision 4 of section 2 of the Criminal Syndicalism Act (Stats. 1919, p. 281), which makes it a felony for any person to inaugurate or assist in inaugurating, or is or knowingly becomes a member of, any organization, society, group, or assemblage of persons, organized or assembled to advocate, teach, or aid and abet criminal syndicalism, as that crime is defined by section 1 of that act.

Seven of the defendants were, on the fourteenth day of October, 1923, arrested by the sheriff of Humboldt County, assisted by several deputies, in a room in a building designated and known as "218 D Street," in the city of Eureka, in said county. The defendants so arrested were Powell, Bryan, McRae, Allen, French, Taylor, and Beavert. The defendant Nicholson was arrested at a subsequent time at some other place in Humboldt County. Longstrath was arrested in the latter part of October, 1923, on a date subsequent to the day on which the seven defendants above named were arrested. He was found by the officers with another man, who was not arrested, temporarily camping on Trinidad beach, in Humboldt County.

The seven defendants first above named, upon being arrested, were taken to the county jail in Eureka, there searched by the officers and from the person of each, with the exception of Beavert, was taken a membership card of the Industrial Workers of the World, and from the posses-

sion of some of them there were also taken certain "credentials" purporting to have been issued by said organization and to confer upon them the authority to discharge certain duties in connection with the promotion of the aims of the organization.

[1] In the opening brief of counsel for the defendants it is expressly conceded that the evidence sufficiently shows that the defendants Powell, Nicholson, and Longstrath were members of the Industrial Workers of the World. As to the defendants Bryan, Taylor, Allen, French, McRae, and Beavert, however, it is contended that the evidence is insufficient to support the finding of the jury that they were members of said organization. This contention, as to all of these defendants, except Beavert, is predicated upon the proposition that, while membership cards and (from some) delegate credentials bearing the names and signatures of said defendants and signed and issued by the general secretary of the I. W. W. were taken from their persons by the officers at the county jail, at the time of their arrest, the officers, when testifying, were unable to name the particular defendant from whom a particular card or particular credentials were taken. To be more explicit: A membership card was taken from the possession of each of the defendants, bearing his name and signature, but the officers, save in one or two instances, were not able to state on the witness-stand, from their own independent recollection, from which of the defendants the particular card or credentials were taken. The objection is without substantial merit. The names on the several cards and credentials, as seen, correspond with the names of the defendants, and it was for the jury to determine whether the cards, etc., were issued respectively to the defendants whose names they bore. It was but a natural inference, under the circumstances, that a card bearing the name of any one of the defendants was taken from the possession of that particular defendant and not from that of some other defendant of a different name. The cards and credentials constituted sufficient evidence to warrant the jury in concluding that the five defendants referred to were members of the organization, and further in finding that said defendants had knowledge of the principles, the doctrines, the

purposes and the policies of the organization. (*People* v. *Flanagan*, 65 Cal. App. 268 [223 Pac. 1014].)

[2] Upon the person of the defendant Beavert a membership card was not found, but it was shown that he was arrested at the local headquarters of the organization in Eureka with the other defendants while they were sitting at a table upon which there were at the time certain documents or writings, purporting to be the minutes of a meeting of the local branch and a record of the activities of certain members of the organization. In the writings purporting to be the minutes or record of the proceedings of certain meetings of the local branch, the name of the defendant, Beavert, appeared in connection with his appointment to the membership of the ''committee on resolutions,'' and also as a member of the ''Leaflet committee''; that he was a duly appointed traveling delegate of the organization or the local branch thereof, and had issued credentials to another member authorizing him to accept applications for membership of the local branch and to collect dues, etc. To these significant circumstances may be added these considerations: That there was no denial, at the time of the arrest of the defendants at No. 218 D Street, that said place, if not the permanent, was the temporary headquarters or office of the local wing of the I. W. W. organization. Moreover, it was conceded that the literature in various forms found at the said place at the time of the arrest of several of the defendants, including Beavert, was printed and published by and under the authority of the I. W. W. There was no denial at any time that the book or writing or document containing the name of Beavert and reciting that he had been appointed as a member of a committee of the organization of the local branch thereof was not what it purported to be, to wit: the minutes or record of the proceedings of some meeting of the local branch of the organization. It was proved, if, indeed, not virtually conceded, that Henry Powell, who was in charge of the place when Beavert and certain other defendants were arrested, was the secretary of the local branch of the organization. There was no attempt to deny that the defendants, other than Beavert, arrested at 218 D Street, were members of the I. W. W. Thus it is clear that there were brought before the jury

circumstances and other considerations from which the jury were well justified in drawing the conclusion that Beavert was a member of the organization in question. It is argued, however, that, to constitute the writings referred to as competent evidence of Beavert's membership of the organization, proof must first be made that said writings were the official minutes of any meeting the proceedings of which they purported to contain the record of. These writings or minutes were signed by "Henry Powell, Sec'y Br.," and it is admitted that that was shown to be the signature of Powell, one of the defendants and secretary of the Eureka branch of the organization. This was a sufficient showing that said writings were the official minutes or record of certain meetings of the local branch of the organization to make them *prima facie* proof of their authenticity or of their official character, and sufficient to warrant an inference to that effect until their probative force was overcome by a countervailing showing, and it was for the jury to say whether such a showing had been made.

[3] It is contended that the evidence is insufficient to support the implied finding of the jury that the organization taught, advocated, and practiced acts of criminal syndicalism to further its purposes.

At the time the seven defendants were placed under arrest at 218 D Street the officers found and took possession of a quantity of the literature of the organization, consisting of books, booklets, pamphlets, magazines, newspapers, and other periodicals. These contained the platform of principles of the organization and also addresses, lectures, and writings, published in the official organs of the Industrial Workers of the World, setting forth and expounding the principles and ultimate purposes of said organization. Extracts from these publications and also from other literature of the organization were introduced in evidence. In fact, substantially the same character of literature was introduced in the present case as was presented in the numerous other like cases hitherto appealed to and decided by the supreme and appellate courts. (*See People* v. *Steelik,* 187 Cal. 361 [203 Pac. 78]; *People* v. *Taylor,* 187 Cal. 378 [203 Pac. 85]; *People* v. *Roe,* 58 Cal. App. 690 [209 Pac. 381]; *People* v. *La Rue et al.,* 62 Cal. App. 276 [216 Pac. 627].) Indeed,

counsel for the defendants in his brief states that the evidence thus introduced in this case and addressed to the proof of the character of the organization, or for the purpose of showing that said organization teaches and advocates the employment of criminal means and measures for accomplishing its aims, was "practically identical with evidence received and considered in the other cases heretofore considered and decided by the courts of appeal," but protests that the evidence introduced herein to establish that element of the offense charged "was insufficient to bring the guilt of the organization down to the time covered by the information." The basis of the latter contention is that much of the literature introduced in the case and in which acts of violence and sabotage, if not openly, were covertly but understandably, advocated as means for achieving the aims of the organization were published and distributed prior to the passage of the Syndicalism Act in the year 1919. But, as will be shown, there was testimony, oral and documentary, other than that afforded by said literature, which showed or tended to show that the organization, after the passage of the Syndicalism Act, did not cease teaching and advocating its radical doctrines and continued after that time to advocate a resort to unlawful means for accomplishing its ultimate objects. Some of the witnesses for the People in this case had testified in other cases previously tried in the courts of different counties of this state. Those witnesses were Albert Coutts, Joe Arada, and the deputy sheriff of Stanislaus County in the years 1917 and 1918, during which years numerous criminal acts of the most diabolical character were committed in said county and the responsibility therefor traced to members of the I. W. W. while prosecuting the activities of said organization in furtherance of its purposes.

Coutts, a member of the I. W. W. from the year 1913 to and including a part of the year 1918, as in the other previously tried cases, gave in this case an extended *résumé* and explanation of the principles, purposes, and activities of the I. W. W. while he was a member thereof and told of innumerable instances of the commission of criminal acts by the members of the organization in avowed furtherance of its ultimate aim. His recital of the atrocities perpetrated

by the members of the organization during the period of his affiliation therewith is in all respects substantially the same as he gave it in every case previously arising and tried under the syndicalism law and in which he was a witness. His story as he told it in the case may be found in many of the cases above named, and there is, therefore, no necessity for repeating it herein.

Joe Arada repeated in this case his testimony as given in the case of *People* v. *Roe, supra,* and other cases named above to the effect that, while he was employed in digging potatoes on a ranch in San Joaquin County in the year 1917, certain members of the I. W. W. applied to the owner of the ranch for like employment, and that in the night-time, while he and other workmen were asleep in a bunkhouse on the ranch, the aforesaid members of the I. W. W. deposited in his (Arada's) shoes a certain chemical combination which, after he had worn the shoes for a few hours the following day, so burned and injured his feet as to compel him to cease working and to remain in a hospital for many months under medical treatment. As stated, the details of Arada's story as he told it in this case may be found briefly recapitulated in the cases above named, particularly in the case of *People* v. *Roe, supra,* and for that reason a repetition herein of the details thereof is uncalled for.

R. G. Davis, a deputy in the office of the sheriff of Stanislaus County in the year 1917, repeated in this case the testimony given by him in the other cases mentioned as to a number of incendiary fires in Stanislaus County in the year just named, resulting in the destruction of valuable property—barns, large stacks of hay, etc.—in various parts of said county, and which, he stated, was satisfactorily shown to be the work of certain members of the I. W. W. Davis' testimony as given in this case is, as before stated, substantially the same as that given by him in the other cases above referred to, and for that reason it need not be reproduced herein.

[4] The testimony of Coutts, Arada, and Davis, although relating to the teachings and practices of the organization before the passage of the syndicalism statute, was, nevertheless, competent for the purpose of showing the unlawful character of the organization. (*People* v. *Steelik,* 187 Cal.

361, 376 [203 Pac. 78].)   In that case it is said that, for the purpose of showing that an organization or assemblage of persons is one that falls within the condemnation of the statute denouncing certain acts as "criminal syndicalism," it is proper to receive and consider evidence of its conduct and activities before as well as after the passage of the statute.   (See, also, *People* v. *Taylor, supra; People* v. *Roe, supra; People* v. *La Rue, supra; People* v. *Flanagan, supra; People* v. *Bailey,* 66 Cal. App. 1 [225 Pac. 752] ; *People* v. *Wagner,* 65 Cal. App. 704 [225 Pac. 464].)

L. Babcock testified that, as a detective connected with the office of district attorney of Sacramento County, and at the request of said district attorney, and for the purpose of securing evidence as to the methods taught, advocated, and practiced by the I. W. W. to accomplish the general scheme of government to which it has committed itself, he joined said organization, at Sacramento, under the name of "L. A. Munson," in September, 1922, and retained his membership thereof until the first day of March, 1924; that in the month of May, 1923, he "took out delegate's credentials," and continued ostensibly to act in that capacity as a representative of the organization during the remainder of the year 1923.   He stated that, while a member, he attended meetings of the organization held at various places in California and that thereat heard the discussions by members of what they conceived to be the more effectual course to be pursued to press to fruition the great central purpose of the organization.   He testified that the members, at certain meetings held at different places, advocated "direct action" and "the strike on the job."   By "direct action," both Coutts and Babcock explained, was and is meant, as the phrase is clearly so understood by all the members, that, where necessary to carry out a particular scheme, the members were (in effect) to take the law into their own hands and commit criminal acts upon property or the persons of the employing class, or, where any of their fellow-members are in the toils of the law for offenses denounced by the Syndicalism Act, to resort to similar methods against the officers of law and so prevent the infliction upon such members of the punishment prescribed by said act for a violation of its provisions.   One of the meetings at which Babcock heard the

latter proposition discussed and indorsed was held at a certain place in Yolo County, immediately across the Sacramento River from the city of Sacramento, in October, 1922. The "strike on the job," so Babcock further explained, is where the members of the organization, being employed by the employing class for the performance of certain labor, are to "shirk" on their work—that is, purposely do as little work as possible—and thereby cause the employer to lose money in operating his enterprise, whatever the nature thereof may be, and so make it unprofitable for the "capitalistic" class, as the organization characterizes all employers of labor, to engage in business, and carry it on profitably. Babcock further testified that, either in September or October, 1923, he saw and read a letter which, at the time, was lying on the desk of the "supply clerk" of the Stockton branch of the I. W. W. organization, in the I. W. W. hall of said city, purporting to be from the "stationary delegate" at Portola, Plumas County, being signed with the stamp of said delegate, and requesting the secretary of the Stockton branch of the I. W. W. "to have all 'cats' to proceed to Quincy (Plumas County) at once to turn the 'cats' loose upon the lumber barons." He also testified that at some time in 1923 he saw and read two letters, one of which was posted on the wall and the other lying on the secretary's desk in the hall of the I. W. W. in Stockton, one bearing the signature of a delegate named William Dawson and the other over the name of a delegate named John Deady. The letter from the first named requested the secretary of the Stockton branch to send all men possible to the rice-fields so that the strike they had started or were about to start could be made a success; that such a course "would improve conditions" in the rice-fields. The Deady letter requested "the Secretary of the Stockton branch to send 110 cats to Colusa—I think Colusa," said Babcock, "but I am not sure about the town." This witness explained that the number, "110," is the designation of the "agricultural branch" of the organization. He further explained, as Coutts and others testified in this and former cases, that the term "cats" was used by the organization for the purpose of designating those members to whom the business of committing acts of sabotage

and violence to physical property was assigned by the organization. The witness further testified, against the objection of defendants that the testimony was hearsay, that in the year 1923, on a street corner in the city of Los Angeles, one Barney Brooks, then "Branch Secretary or Stationary delegate" of the Los Angeles wing of the organization, referring, in the presence of the witness and several other members of the I. W. W., to a fire which but a few days before had partially destroyed the Edison Electric plant at Eagle Rock, Los Angeles County, declared that "we ought to burn the whole damned works." Babcock testified to other happenings in I. W. W. halls and the declarations by the members of the organization in the course of discussions at the meetings thereof in various, places in the state in 1923 and 1924 which clearly indicated that, since the passage of the Criminal Syndicalism Law, the organization has continued to advocate and indorse employment by its members of unlawful means in furthering the accomplishment of the radical and, indeed, revolutionary plan for overthrowing our existing systems of government. The testimony thus referred to need not be gone into in detail herein. Enough of the details of his testimony have been given above to show that there is evidence to support the implied findings of the jury that both before and subsequent to the passage of the Criminal Syndicalism Law the organization has stood for the commission of criminal acts to push forward its movement to revolutionize the present forms of government of the states and the United States and introduce in lieu thereof what the members are pleased to call an industrial government, whatever that may mean.

[5] The defendants did not take the witness-stand in their own behalf. Other members of the organization, however, testifying for the accused, stated that the policy of the organization as to the means by which it had always endeavored to carry out its central object was to do so by peaceable and lawful methods; that, since the Criminal Syndicalism Act became a law, the organization had repeatedly, through its official publications and its lecturers, vigorously condemned the employment of violence or the resort to criminal acts or instrumentalities for effectuating its ultimate purposes and had strictly enjoined its members

against the commission of crime or acts of lawlessness for any purpose. Extracts from articles appearing in their official publications issued and circulated by authority of the organization and from lectures delivered by its members since the passage of the statute, emphatically admonishing its members to refrain from committing unlawful acts in prosecuting their activities in behalf of the organization, were admitted in evidence and read to the jury. In a word, the defendants were by the trial court accorded unrestricted latitude, consistently, of course, with the law of evidence, in the matter of making their defense along the lines just indicated. The effect of this showing, though, is only to create a substantial conflict upon the question of the character of the organization—whether its methods of prosecuting its scheme to success are unlawful or such as are denounced by the Criminal Syndicalism Law. Hence, the judgment of the jury upon that issue, as evidenced by their verdict, cannot legally be superseded by that of this court.

[6] There are a few of the rulings which merit special attention herein. It is contended that the testimony of Babcock as to the conversation he had with Barney Brooks on a street of Los Angeles relative to the partial destruction by fire of the Edison electric plant at Eagle Rock involved a narrative of a past event, and was, therefore, incompetent. (*People* v. *La Rue*, 62 Cal. App. 276, 283 [216 Pac. 627, 630].) It must be conceded that the statement imputed to Brooks is reasonably subject to the construction that it implied that the fire was the incendiary work of persons affiliated with the organization, and that the act was instigated and sanctioned by the organization itself. But we think that the testimony was, nevertheless, properly received. It will not be doubted that it was relevant to the issues of the case. The objection to it is addressed to the question of its competency, and as to this proposition it was only necessary, to render it competent, that it be made to appear, as we think it was made to appear, that the declaration to which the testimony related was made by one authorized to speak for the organization. Brooks, at the time of making the statement, was an officer of the Los Angeles branch of the organization. He was secretary and a delegate of the branch organization and it is a reasonable inference, from the nature of his official relation to the organization, that

in his capacity as delegate, if not in both his official capacities, he was invested with full authority not only to secure recruits to the ranks of the organization, but to declare, interpret, and advocate the adjective as well as the substantive laws and principles constituting its general political platform or propaganda, and that, upon all matters pertaining to its purposes and activities, his voice was its voice. In this view, testimony of his extrajudicial admissions of atrocities committed in the past by members of the organization in pursuance of its teachings and with its indorsement, would be competent testimony as in proof of the unlawful character of the organization.

In his opinion in the case of *People* v. *Flanagan, supra,* Presiding Justice Finch, while not expressly stating that testimony of the extrajudicial declaration of an officer of the organization implying or directly admitting that certain acts of lawlessness had at some time in the past been committed by certain members to further its ultimate aims, at least intimates that such testimony is admissible, particularly where, as here, all the circumstances and the nature of the official duties of such officer reasonably justify the inference that the declarant is or was authorized to speak for the organization. But Brooks' declaration amounted to more than an implied reference to a past event. It involved an expression of the then present attitude of the organization as to the methods it believed in and advocated to accomplish its aims—that is to say, the declaration constituted some evidence that the organization, notwithstanding that the Criminal Syndicalism Act was then in existence, believed in, advocated and would employ criminal means for establishing its scheme of government.

[7] The next and the last point of which special notice will herein be given involves the rulings of the court permitting the prosecution to prove by parol the contents of the letters which Babcock stated that he saw and read in the hall of the Stockton branch of the organization and to which we have above referred. When objection to said testimony was made, the district attorney stated that he did not have the letters in his possession and asked the attorney for the defendants if he had possession of them, to which the latter with some show of indignation responded that he did not have any such letters, but that if he had them in his possession

71 Cal. App.—33

he would not deliver them to the district attorney. The testimony of Babcock was that the last time he saw the letters they were still in the hall of the Stockton wing of the organization.

The rule of our code with regard to the proof of a writing is that there can be allowed no evidence of the contents thereof, other than the writing itself, except in certain specified cases, among which are the following: "1. When the original has been lost or destroyed, in which case proof of the loss or destruction must first be made; 2. When the original is in the possession of the party against whom the evidence is offered, and he fails to produce it after reasonable notice." (Code Civ. Proc., sec. 1855.) In the instant case, the letters were not shown to be in the actual possession of the defendants. The reasonable inference from Babcock's testimony was that they were still in the possession of the officers of the local branch of the organization at Stockton. Notice to the defendants to produce them would obviously have been futile. It is equally obvious that a *supoena duces tecum* directed to the officer or officers having official possession and control of the writings, commanding them to produce them in court, would have been futile, since those officers were co-conspirators of the defendants, and could not have been compelled to produce and expose in court the contents of any written document which would tend, as the letters in question would certainly tend, to connect the officer producing them with the commission of the same or like crime for which the defendants were on trial. Thus it is clear that it would have been, and presumably the trial court so viewed the situation, an idle act—indeed, a nonsensical act—to have ordered a *duces tecum subpoena* to issue and to be served with the view of procuring, for the purpose of fortifying the People's case, the production of those letters. There was then no other conceivable way in which the contents of the letters could be presented to the jury than by means of parol testimony, and the question now is whether, under such circumstances, such testimony is legally available for that purpose. The *character* or *quality* of the evidence thus brought into the case is, manifestly, no different from that which is declared by the code to be competent and, consequently, proper in certain enumerated instances, where the specified conditions upon which such testimony is re-

ceivable have been met. If, therefore, there be any differ-
ence between the situation where secondary evidence of the
contents of a writing is, by express provisions of the law,
allowable, and the situation presented here, it is not in the
fact that the parol testimony in the case first mentioned is
abstractly superior in evidentiary value to such testimony
in the other, but in the fact that in the one case the legisla-
ture has expressly declared that, when circumstances arise
which will authorize its reception, it is proper testimony,
while in the other case there is no express authority in law
for allowing it. We are of the opinion, however, that,
under the circumstances of this case, parol testimony of the
contents of the letters referred to is admissible upon the
theory that, in legal effect, the letters are as much lost to
the people as though they were actually lost or their where-
abouts unknown and cannot be traced. Indeed, we feel
safe in saying, as a result of our investigation of the ques-
tion, that the consensus of judicial opinion, as well as that
of the text-writers, is that, under circumstances such as are
present in this case, parol testimony is admissible for the
purpose of proving the contents of written documents upon
the theory above suggested. It may be true that there is
an apparent difference of opinion as to the particular ground
upon which such testimony is admissible under circumstances
similar to those existing in the case, but, in our opinion,
the difference is only apparent and is due to the nature of
the verbal statement of the rule or the form in which it
is expressed in some of the cases and by some of the text-
writers. However, it is not a matter of any consequence as
to the particular theory upon which the testimony is admis-
sible so long as it is admissible upon any reasonable theory
within the spirit or contemplation of the code section.

In *United States* v. *Reyburn,* 6 Pet. (U. S.) 352 [8 L. Ed.
424], the prisoner was indicted for unlawfully issuing a
commission in writing for a certain vessel "to the intent
that such vessel might be employed in the service of a
foreign people, that is to say, in the service of the United
Province of Rio de la Plata, to cruise and commit hostilities
against the subjects and property of a foreign prince, . . . ,
with whom the United States were at peace." The proof of
the contents of the commission was necessary to the estab-
lishment of the crime against the accused, and the commis-

sion was in the possession of one Chase, who was also connected with and criminally culpable in the transaction. The question arose at the trial whether it was proper, under the indicated circumstances, to prove the contents of the commission by parol. The court, holding that parol evidence of the contents of the commission was admissible, said, among other things:

"A subpoena to compel his (Chase's) attendance would have availed nothing, and the law does not require the performance of an act perfectly nugatory. But suppose Chase had been within the reach of a subpoena, and had actually attended court, he could not have been compelled to produce the commission, and thereby furnish evidence against himself. . . . Rules of evidence are adopted for practical purposes in the administration of justice, and must be so applied as to promote the ends for which they are designed."

The foregoing statement of the rule in such instances as the present is approved by the authors of Encyclopedia of Evidence, volume 2, pages 346, 347, where it is said: "Tracing the primary evidence to the possession of one interested in its retention and who, although called, could not be compelled to produce it because it would tend to incriminate him, is enough to let in secondary evidence," citing a number of cases in the footnotes.

In *State* v. *Dreany,* 65 Kan. 292 [69 Pac. 182], the defendants were accused of and tried upon a charge of combining and entering into an unlawful agreement with other named parties to pool and fix the price to be paid for grain at a certain named place. The contents of the agreement, which was in writing, were necessary to be proved to make out a case. It was not shown that the writing was in the possession of the defendants, but it was made to appear that it was not in the possession of and under the control of the prosecuting attorney. That officer served notice upon the defendants to produce the written agreement at the trial. The document was not produced by the accused, and the court allowed the prosecuting attorney to prove its contents by parol evidence. Upon appeal, the point was urged that the reception of parol evidence for that purpose was error. The supreme court held otherwise, and said:

"It is clear that, if such writing is shown to be in the possession of the defendants, they could not be compelled,

by notice or otherwise, to produce it as evidence to be used in a prosecution against them. It is further apparent that, if such writing were shown to be in the possession of defendants, it would be as completely lost to the prosecution, so far as any power existed to procure it as evidence upon the trial, as though it were lost or destroyed altogether. And in such case parol evidence of its contents has been held admissible by this court. *State* v. *Gurnee,* 14 Kan. 111. As the writing in question was not in the possession of nor under the control of the prosecution, and as it was not within the power of the state to produce it at the trial, we are inclined to the opinion that it was not error to receive secondary evidence of its contents after proof duly made of its existence and execution.''

The same general principle underlies the following rule as stated in 2 Wigmore on Evidence, section 1212: ''It is also often said that where the third person is hostile and *fraudulently* detains the document, this fact of itself suffices to excuse nonproduction.'' (See, also, *Stark* v. *Burke,* 131 Iowa, 684 [109 N. W. 206].)

We conclude that, under the circumstances as shown, the ruling permitting secondary evidence of the letters in question was legal and proper.

There are no other points which it is deemed necessary to consider herein.

The judgment and the order as to each of the defendants are affirmed.

Plummer, J., and Finch, P. J., concurred.